NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 7, 2023

S22A1266.  HUFF v. THE STATE

COLVIN, Justice.

Appellant Jazzy Huff was convicted of felony murder and related offenses in connection with the August 2019 shooting death of Zenas Lee Davis.[1]  On appeal, Appellant contends that (1) insufficient evidence supported his convictions; (2) the trial court

---

[1] Davis died on August 21, 2019.  On September 4, 2019, a Dougherty County grand jury indicted Appellant for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4).  A jury trial was held from March 9 to 12, 2020.  Appellant was acquitted of malice murder (Count 1) but was found guilty of the remaining counts.  On August 19, 2020, the trial court imposed a sentence of life in prison with the possibility of parole for felony murder (Count 2) and a consecutive sentence of five years' probation for possession of a firearm during the commission of a felony (Count 4).  The aggravated assault count (Count 3) merged into the felony murder count (Count 2) for sentencing purposes.  On September 15, 2020, Appellant's trial counsel timely filed a motion for new trial, which was amended through new counsel on October 1, 2021.  The trial court denied the amended motion on June 13, 2022.  Appellant filed a timely notice of appeal.  The case was docketed to our August 2022 term and submitted for a decision on the briefs.

erred in admitting irrelevant, improper, and prejudicial character evidence that Appellant held a firearm "gangster style" prior to firing the gun; (3) the trial court erred in admitting irrelevant, improper, and prejudicial character evidence that Appellant held the firearm the way an armed robber might hold a firearm; (4) he was deprived of an impartial jury because jurors had improper, unsupervised contact with the victim's family during deliberations; (5) trial counsel was ineffective for failing to object to irrelevant, improper, and prejudicial character evidence; and (6) the cumulative effect of the trial court's evidentiary errors and trial counsel's ineffective assistance unfairly prejudiced Appellant and deprived him of his right to due process and a fair trial. For the reasons set forth below, we affirm.

1. Appellant first asserts that the evidence presented at trial was insufficient as a matter of constitutional due process to sustain his convictions because the State failed to prove beyond a reasonable doubt that Appellant was not justified in using self-defense. We disagree.

2

The evidence presented at trial showed the following. On the morning of August 21, 2019, Appellant, who owned Jazzy Movers, met to discuss an upcoming job opportunity with a group of independent contractors, including Davis, outside Jazzy Movers' headquarters in Albany, Georgia. During this meeting, Appellant informed the contractors that the job entailed packing and moving furniture at a location in Moultrie, Georgia. Appellant further informed the contractors that they would be paid for their services on Friday, August 23. The contractors were then transported to the job site, which was approximately 30 minutes away.

Two hours after the contractors began packing furniture, Appellant observed Davis sitting on the back of the moving truck. When Appellant asked Davis why he was not working, Davis told Appellant that "he was tired" because he had been "working all day." Davis then requested that Appellant pay him $20 for the two hours he had worked. Appellant reiterated that Davis would be paid on Friday, at which point a disagreement ensued. Davis demanded that Appellant drive him back to Albany so that he could discuss

3

receiving his payment with Appellant's business partners. Appellant then drove Davis and one other contractor, Jay Barron, back to Jazzy Movers' headquarters. Barron testified that, during the car ride, Davis was angry and cursing but did not threaten Appellant.

When Appellant parked the car in front of Jazzy Movers' headquarters, Davis refused to get out before Appellant because "he didn't want [Appellant] to drive off." Appellant and Barron then got out of the car, walked into the building, and proceeded onto the elevator toward the second floor. Davis entered the building behind them but took the stairs. While on the elevator, Appellant told Barron to "pull out [his] phone and [start] record[ing], just in case something happened." Appellant testified that he had asked Barron to begin recording because he was concerned that Davis might file a worker's compensation claim. Although Appellant believed at the time that Barron was recording only audio, Barron in fact recorded a video, which was later played for the jury at trial.

The video showed the following. Appellant walked across a

4

large room into an adjoining smaller room with Davis following him. After Davis entered the smaller room, Appellant turned around to face him and said, "You will get your check on Friday, man." For the next minute, Appellant and Davis argued back and forth, with Davis cursing and Appellant threatening to call security. Appellant then walked out into the larger adjoining room with his back facing Davis.

Davis immediately followed him out while stating, "What if I f***ing swing on you?" As Davis continued walking in a straight line toward the exit, Appellant took two small steps to the right while quickly turning to face Davis, pulling out a .40-caliber pistol, and racking the slide. Appellant then pointed the pistol at Davis's chest, holding the pistol with the handgrip horizontal to the ground and said, "Let's go then, man." In response, Davis turned and started walking toward Appellant while repeatedly saying, "F***ing shoot me, bro." Meanwhile, Appellant lowered the firearm to his side and held out his other hand toward Davis while telling him several times to "back up."

Davis stopped walking toward Appellant but continued arguing. As Davis briefly turned to look at Barron, he asked Appellant, "Did you just pull your f***ing gun on me?" Appellant then said Davis's name, at which point Davis turned back toward Appellant, took a half step in Appellant's direction with his arms lowered and his chest puffed up, and asked again, "Did you just pull your f***ing . . . ?" Before Davis could finish his question, Appellant opened fire on Davis, shooting multiple rounds in quick succession as Davis grabbed his chest, turned away, and fell to the floor.

After falling to the ground, Davis dropped from his hand a small, yellow object, which was later identified as a lighter. Stepping out of view of the camera, Appellant can be heard on the recording calling 9-1-1 and telling the operator, "Sir, I just shot somebody." Following the operator's directions, Appellant performed chest compressions on Davis for several minutes, but Davis was unresponsive. When officers arrived on the scene and asked who shot Davis, Appellant responded, "I did." Appellant then complied with officers' instructions to turn around and be

6

handcuffed. Appellant was taken into custody and interviewed by Sergeant Chris Hutcherson.

Sergeant Hutcherson testified that during the interview Appellant stated that Davis "had some authority problems" because Appellant was younger than Davis and that Appellant "felt threatened" by Davis because "he knew [Davis] had a record." Sergeant Hutcherson further testified that at no point during the interview did Appellant indicate that he believed Davis had some sort of weapon in his hand.

Taking the stand in his own defense, Appellant testified that he had shot Davis in self-defense. Appellant explained that he felt threatened when Davis said, "What if I f***ing swing on you," since Appellant's back was turned when Davis made the comment and Appellant knew Davis had a criminal record. Appellant explained that, in response to the threat, he pulled out his firearm, "racked a round," and turned toward Davis. But Appellant testified that he "never had any intent to use [the firearm]." Appellant further testified that, because Davis was "confidently pursuing" him despite

7

seeing the firearm, Appellant believed Davis had some sort of weapon. Appellant explained that he then saw a "flicker of yellow and black" in Davis's hand and assumed it was a box cutter that the workers sometimes used to unpack furniture, although the evidence later showed that the item in Davis's hand was actually a lighter. Appellant testified that he shot Davis because he was "terrified" that Davis would use the box cutter as a weapon against him. However, on cross-examination, Appellant stated that, prior to pulling out the firearm, he "was not looking at [Davis's] hands."

When the prosecutor asked Appellant why he did not mention to Sergeant Hutcherson at any point during his post-arrest interview that he believed Davis had a box cutter, Appellant responded, "I don't believe I was in the right state of mind." The prosecutor also questioned Barron about whether Jazzy Movers had supplied box cutters for the moving job that morning. Barron testified that the company did not provide box cutters and that he did not observe Davis or "anybody using box cutters that morning."

The medical examiner who performed Davis's autopsy testified

8

that Davis's "cause of death was multiple gunshot wounds" and that a "total of eight gunshot wounds" were found in Davis's body, the majority of which struck Davis from behind. The medical examiner further testified that Davis's wounds indicated that he had likely "turn[ed] to the right to get out of the way of being shot" and that five of the gun shots "could have been lethal" on their own.

On appeal, Appellant contends that the trial evidence established that he acted in self-defense under OCGA § 16-3-21 (a), which provides in relevant part that a person is justified in using deadly force "if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself . . . or to prevent the commission of a forcible felony." According to Appellant, the trial evidence showed that he reasonably employed "non-lethal" force by drawing his firearm in response to Davis's threat to "swing" on him and then reasonably employed deadly force when Davis continued to pursue him. Therefore, Appellant argues, the State failed to prove beyond a reasonable doubt that Appellant was not justified in defending himself. We disagree.

9

When evaluating the sufficiency of evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court will uphold the jury's verdict "[a]s long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case." *Scott v. State*, 309 Ga. 764, 766 (1) (848 SE2d 448) (2020) (citation and punctuation omitted). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Birdow v. State*, 305 Ga. 48, 50 (1) (823 SE2d 736) (2019). However, it is the role of the jury to evaluate the evidence and decide whether the defendant was justified in using deadly force in self-defense. See *Howard v. State*, 298 Ga. 396, 398 (1) (782 SE2d 255) (2016). In evaluating the evidence, "[the] jury is free to reject a defendant's claim that he acted in self-defense." Id.

Here, the trial evidence was sufficient to authorize the jury to

conclude that Appellant did not reasonably believe that deadly force was necessary to defend himself during the encounter with Davis and thus to reject Appellant's self-defense claim. Specifically, the video recording of the incident authorized a jury to find that Appellant did not reasonably fear that Davis posed a threat of death or great bodily injury either when Davis commented about "swinging" at Appellant or when Davis approached him. Instead, the jury could have reasonably concluded from the video recording that Appellant did not shoot Davis in self-defense because Appellant invited a physical encounter with Davis by pulling a gun, pointing it at him, and saying, "Let's go then, man," and Davis's conduct in approaching Appellant with his arms down and asking if Appellant had really pulled a gun on him did not give rise to a reasonable belief that Davis was threatening to physically harm Appellant.

Moreover, a rational jury could have disbelieved Appellant's claim of self-defense based on his own trial testimony. See *Walker v. State*, 312 Ga. 232, 235 (1) (862 SE2d 285) (2021) (noting that "the jury was entitled to disbelieve [the defendant's] testimony" in which

11

he claimed that he fired in self-defense).  See also *Mims v. State*, 310 Ga. 853, 855 (854 SE2d 742) (2021) ("[T]he defendant's testimony, in which he claimed he was justified or provoked into acting, may itself be considered substantive evidence of guilt when disbelieved by the jury, as long as some corroborative evidence exists for the charged offense.").  This is particularly true here, where Appellant's testimony at trial and his statements during his interview immediately after the shooting were inconsistent.  Appellant testified at trial that he shot Davis because he believed Davis had a box cutter in his hand that he intended to use as a weapon against Appellant.  However, in his post-arrest statement to police he never mentioned the box cutter.  Thus, the jury was authorized to reject Appellant's claim that he shot Davis in self-defense and to find him guilty beyond a reasonable doubt of felony murder and the other crimes for which he was convicted.  See *State v. Newman*, 305 Ga. 792, 795 (1) (827 SE2d 678) (2019) ("[T]he evidence presented at trial was sufficient to authorize a rational jury to reject [the defendant's] claim[] of . . . self-defense and to find him guilty beyond a reasonable

12

doubt of the crimes for which he was convicted.").

2. Appellant next contends that the trial court erred in permitting the prosecutor to refer to Appellant's manner of holding the firearm as "gangster style." The prosecutor first used the phrase "gangster style" during his opening statement, when he told the jury that it would see a video in which Davis "turns around and sees a gun in his chest, gangster style. Gangster style, turned to the side. And then [Appellant] says let's go then." Then, during its direct examination of Barron, the prosecutor used the phrase "gangster style" again. Specifically, after playing Barron's video for the jury, the prosecutor asked Barron, "And you saw a gun pointed gangster style in [Davis's] chest, just like we saw in this video, didn't you?" Barron replied, "Correct." Defense counsel did not timely object during either the State's opening statement or Barron's testimony.[2]

---

[2] The day after Barron testified, defense counsel moved "for the Court to direct the District Attorney's Office to stop using any word affiliated with the word gang," arguing that the phrase "gangster style" erroneously implied that Appellant was "somehow gang-related." Although the court noted that, when it heard the prosecutor use the phrase "gangster style," it initially understood the phrase as "a descriptor" of how Appellant was holding the gun, the court

On appeal, Appellant argues that the trial court erred in permitting the prosecutor to use the phrase "gangster style" because the phrase was improper character evidence in violation of OCGA § 24-4-404 (a)[3], not relevant and therefore inadmissible under OCGA § 24-4-402[4], and should have been excluded pursuant to OCGA § 24-4-403[5] because its probative value was substantially outweighed by the danger of unfair prejudice. This enumeration of error fails.

As an initial matter, opening statements are not considered evidence, and failure to timely object to a remark in opening statements waives the issue on appeal. See *Phillips v. State*, 285

---

ultimately sustained Appellant's motion in part. Specifically, the court ruled that the State could no longer use the phrase while examining witnesses but could use it as a descriptor during closing arguments. However, following the court's ruling, the prosecutor did not use the phrase again either with witnesses or in closing arguments.

[3] OCGA § 24-4-404 (a) provides, in pertinent part, "[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion."

[4] OCGA § 24-4-402 provides, in pertinent part, "[e]vidence which is not relevant shall not be admissible."

[5] OCGA § 24-4-403 provides, in pertinent part, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

14

Ga. 213, 217 (3) (675 SE2d 1) (2009) ("The failure to object to the remark [made during the opening statement] . . . constitutes a waiver of the issue on appeal."). Here, because defense counsel failed to timely object to the prosecutor's use of the phrase "gangster style" during opening statements, Appellant's challenge to the State's opening statement was not preserved for review, and plain error review does not apply to comments made by lawyers during opening statements. See *Simmons v. State*, 299 Ga. 370, 372-373 (2) (788 SE2d 494) (2016).

Although Appellant did not timely object when the prosecutor elicited witness testimony that Appellant held the firearm "gangster style," we may review his claim that the trial court erred in admitting such testimony for plain error. See OCGA § 24-1-103 (d). See also *Adams v. State*, 306 Ga. 1, 3 (1) (829 SE2d 126) (2019) (noting that plain error review is available under OCGA § 24-1-103 (d) for unpreserved challenges to evidentiary rulings). To establish plain error, Appellant

must point to an error that was not affirmatively waived,

15

> the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Kemp v. State*, 303 Ga. 385, 397-398 (3) (810 SE2d 515) (2018) (citation and punctuation omitted).

Here, assuming without deciding that the trial court clearly erred in admitting into evidence Barron's testimony that Appellant held the gun "gangster style," Appellant cannot satisfy the third prong of plain error review, which requires him to demonstrate that "the outcome of the trial court proceedings likely was affected." *Hightower v. State*, 304 Ga. 755, 759 (2) (b) (822 SE2d 273) (2018) (citation and punctuation omitted). To the extent that the phrase caused any prejudice, it was unlikely to affect the outcome of the trial. The prosecutor only briefly used the phrase "gangster style" while examining Barron, and nothing introduced into evidence or presented in the record suggests that the phrase was used to suggest that Appellant was a gang member, that the shooting was gang related, or that Appellant had a propensity to commit violence.

16

Additionally, the jury viewed for itself the video recording of the entire incident and heard testimony that Appellant had changed his story about why he believed deadly force was necessary. In light of the evidence presented, we cannot say that any error in admitting into evidence the "gangster style" reference likely affected the verdict. See *Harris v. State*, 302 Ga. 832, 835 (2) (809 SE2d 723) (2018) ("[The defendant] has failed to establish that the error affected his substantial rights, given the strong evidence of guilt against him."). Accordingly, Appellant has not shown plain error.

3. Appellant also asserts that the trial court erred in permitting a witness to testify that the manner in which Appellant held the firearm was akin to the manner in which armed robbers hold a firearm. This claim fails.

During his direct examination, Sergeant Hutcherson testified that he had "several years of experience in firearms," was "on SWAT Team," and was currently "in a firearms instructor course." The prosecutor then asked him why a person may "cant" (that is, tilt) a firearm sideways, as Appellant had done. Sergeant Hutcherson

17

responded, "Most people who pull a firearm in that manner are either pulling it out to intimidate the other person [or] punk the other person." Sergeant Hutcherson further explained, "You may see people pull that firearm in that manner in an armed robbery, when they're trying to rob someone, they'll cant the firearm in that manner."

Neither the State nor any witnesses referenced armed robbery again and defense counsel objected to Sergeant Hutcherson's testimony only on the ground that the State was improperly bolstering the testimony of a previous witness. Because defense counsel did not object on any other ground, Appellant did not preserve for ordinary appellate review the contentions raised here, namely, that the testimony was improper character evidence, irrelevant, and inadmissible under Rule 403. See *Payne v. State*, 313 Ga. 218, 221 (1) (869 SE2d 395) (2022) (noting that a defendant's evidentiary objection at trial failed to preserve for ordinary appellate review a different evidentiary challenge to the same testimony). See also *Harris v. State*, 307 Ga. 657, 663-664 (2) (a)

18

(837 SE2d 777) (2020) ("[B]ecause [the defendant] did not make a specific objection at trial to the admission of his statements on the ground now asserted in his appeal, we review these claims only for plain error."). Accordingly, we review Appellant's contentions only for plain error. See OCGA § 24-1-103 (d). Even assuming that the armed-robbery reference was improper, Appellant has failed to demonstrate that any error in admitting the evidence likely affected the outcome of his trial. As explained in Division 2, the evidence against Appellant was strong, and the reference to armed robbery was brief. Because Appellant has not shown that the armed-robbery reference affected his substantial rights by likely affecting the outcome of the trial court proceedings, Appellant has not demonstrated plain error. See *Watson v. State*, 303 Ga. 758 (814 SE2d 396) (2018) (no plain error where it was "not probable that the jury would have reached a different verdict had it not heard [the challenged evidence]").

4. Appellant also asserts that he was deprived of his right to an impartial jury under the Sixth Amendment to the United States

Constitution because the jury had improper, unsupervised contact with the victim's family during deliberations. The record shows that, during jury deliberations, defense counsel reported to the trial court that a group of jurors had been standing "very close" to some of Davis's family members during a break and that deputies, who also observed the parties in close proximity, reported that "there was no communication" between the parties and that "it appeared to be purely innocent." The court indicated that it would take measures to prevent the possibility of future interactions between the jury and family members, and defense counsel did not request any further relief. Because defense counsel did not assert a Sixth Amendment claim or seek any relief from the trial court when he discovered the allegedly improper jury contact, this Sixth Amendment claim is not preserved for appellate review. See *Moore v. State*, 294 Ga. 450, 451 (2) (754 SE2d 333) (2014) (concluding that the defendant's failure to "make a contemporaneous motion for a mistrial when it was discovered that" three jurors had seen an unredacted reference to the defendant's prior guilty plea "waived review of th[e] issue on

20

appeal").

5. Appellant next asserts that he received constitutionally ineffective assistance of counsel because defense counsel failed to object to evidence that Appellant held the firearm "gangster style" and that canting the firearm sideways was an intimidation tactic commonly used by armed robbers. We disagree.

To succeed on a claim of ineffective assistance of counsel, a defendant must show both "that his counsel's performance was professionally deficient and that he suffered prejudice as a result." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). To prevail on the deficiency prong, the appellant "must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances in light of the prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (2) (787 SE2d 221) (2016). "To prove prejudice, Appellant must demonstrate that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have

21

been different." *Washington*, 313 Ga. at 773 (3). A defendant's failure "to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong." *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015).

Here, Appellant has failed to satisfy the prejudice prong of the *Strickland* test. As explained in Divisions 2 and 3, because of the strong evidence against him, Appellant is unable to demonstrate a reasonable probability of a different result if trial counsel had objected to the "gangster style" and "armed robbery" references. See *Stepp-McCommons v. State*, 309 Ga. 400, 407 (4) (a) (845 SE2d 643) (2020) ("[T]his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." (citation and punctuation omitted)). Accordingly, Appellant's claim of ineffective assistance of counsel fails.

6. Finally, Appellant claims that the cumulative effect of the asserted trial court errors and ineffective assistance of counsel violated his right to due process and a fair trial. We disagree.

To establish cumulative error a defendant must demonstrate that "at least two errors were committed in the course of the trial" and "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *State v. Lane,* 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (citation and punctuation omitted). When considering the "cumulative effect of presumed errors by trial counsel and the trial court," this Court "consider[s] collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." *Patterson v. State,* 314 Ga. 167, 181 (5) (875 SE2d 771) (2022) (citation and punctuation omitted). Here, Appellant's claim fails because Appellant has not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial, given the strong evidence against him, including the recorded video of the incident and Appellant's inconsistent explanations of the shooting.

*Judgment affirmed. All the Justices concur.*