**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**



## SUPREME COURT OF GEORGIA

Case No. S24A0725

October 31, 2024

## BRYAN OKEITH MILLER v. THE STATE.

Upon consideration, the deadline for a motion for reconsideration in this case has been revised. It is ordered that a motion for reconsideration, if any, must be filed no later than **4:30 pm on Wednesday, November 6, 2024**.

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.

Witness my signature and the seal of said court hereto affixed the day and year last above written.

_Therese S Barnes_, Clerk

In the Supreme Court of Georgia

Decided: October 31, 2024

S24A0725. MILLER v. THE STATE.

LAGRUA, Justice.

A jury convicted Appellant Bryan Miller of the malice murder of his wife, Gracie Miller, and of the aggravated assault of his wife's adult niece, Shamone Morris, both of whom he shot multiple times.[1]

---

[1] The crimes at issue occurred on May 18, 2021. On August 12, 2021, a Gwinnett County grand jury indicted Miller on the following counts: malice murder of Gracie (Count 1); felony murder predicated on the aggravated assault of Gracie (Count 2); aggravated assault of Gracie (Count 3); aggravated assault of Morris (Count 4); possession of a firearm during the commission of a felony (Count 5); possession of a firearm during the commission of a felony (Count 6). Miller was tried in May of 2023 and a jury convicted Miller on all counts. As to Count 1 (malice murder), the court imposed a life sentence without the possibility of parole. Count 2 (felony murder) was vacated by operation of law and Count 3 (aggravated assault of Gracie) merged by operation of law. As to Count 4 (aggravated assault of Morris), Count 5 (possession of a firearm during the commission of a felony), and Count 6 (possession of a firearm during the commission of a felony), the court imposed an aggregate sentence of 30 years to serve concurrent with the life sentence for Count 1. Miller timely filed a motion for new trial, which he later amended through new counsel. On December 1, 2023, the trial court held a preliminary hearing on the motion for new trial, during which the parties agreed to adjourn until the State had an opportunity to respond to the amended motion, further

Miller's sole enumeration of error on appeal is that the trial court abused its discretion when it admitted evidence of two prior incidents involving his wife pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"). Within that enumeration, Miller raises three arguments: (1) the admission of this evidence was erroneous because Miller claimed self-defense, which negates the relevance of motive and makes the other-acts evidence far more prejudicial than probative; (2) the State only presented a plea of nolo contendere as to one of the incidents, which by itself was insufficient to prove Miller's involvement therein; and (3) the trial court failed to rule on the admissibility of the other acts with respect to the assault against Morris, which were extrinsic and unduly prejudicial regarding that assault. For the reasons that follow, we affirm.

According to the evidence admitted at trial, on May 15, 2021, three days before the shooting, Morris came to Georgia to visit her

---

agreeing that the trial court would rule on the briefs thereafter. On January 12, 2024, the trial court denied Miller's motion for new trial. Miller filed a timely notice of appeal to this Court on January 12, 2024, and his case was docketed to the April 2024 term of this Court and submitted for a decision on the briefs.

family, including her aunt, Gracie, and Gracie's husband, Miller. Morris stayed in the guest bedroom in the Millers' apartment during her visit. Morris and Gracie were close and had spoken almost every day for years, but Morris had never met Miller in person prior to this visit.

Morris described the first day of her visit as "a very good time . . . [e]veryone was happy . . . [i]t was all good." She said Miller made her feel "at home." However, Morris testified that by the second day of her visit, she noticed a "little shift" in Miller's attitude; he began ignoring everyone. According to Morris, the next day was worse, with Miller acting "a bit standoffish."

Morris testified that, on the morning of May 18 – the day of the shooting – Miller was again "standoffish." Morris and Gracie left that morning to meet a realtor to look at houses. The two returned to the Millers' apartment sometime between 5:00 and 8:00 p.m., when it was "dark." Once inside, Gracie sat on the couch in the living room and Morris sat on the floor in front of her, so that Gracie could braid Morris's hair. They turned on the television for "background

4

noise."

According to Morris, about this time Miller began walking in and out of the master bedroom "mumbling things." Gracie tried to talk to Miller, but Morris told her, "[j]ust don't engage." The third time Miller came out of the bedroom he told Morris, "[n]o smoking weed in the house." Morris testified that she told him that she had not smoked marijuana in his house and that she would respect his request.

Notwithstanding, Morris testified that Miller came in and out of the living room "multiple times" thereafter and seemed to be trying to get Gracie's attention. Morris also testified that Miller "looked very blank. The eyes were very red. He looked like he was upset, like he wasn't himself, not the person that I spoke on the phone with and I met with the first day I got there on Saturday. It was a totally different person." Morris testified that Miller appeared to be under the influence of alcohol, though she never saw him drink that day.

Morris also said that Miller "lifted up his shirt and he said . . .

there's no smoking;" in fact, "he kept lifting up his shirt like coming out, like pulling it up," which she construed as "intimidation." Morris testified that although she interpreted the behavior as threatening, she chose to ignore it, as did Gracie. Instead, the women chatted with each other while Gracie braided Morris's hair, and the two "were laughing a lot" at the television show in the background.

As Gracie was "finishing" Morris's hair, Miller "came out and he had [a] weapon in his hand . . . a black gun . . . with a very long extended clip." Morris testified that "he just started letting it off . . . like shooting." Gracie cried out to Morris, asking her to tell Gracie's mother that Gracie loved her. Gracie also cried out to Miller "please don't shoot me in the face." Morris testified that she closed her eyes and "played as dead as possible when he started shooting after [Gracie] said what she said." Morris "grabbed" Gracie's leg, slowed her own breathing, and told herself to "relax and just lay here and try not to move so much."

Miller shot Gracie a total of six times: twice in the thigh, once

in the chest, once in the arm, once in the side, and once to the right side of her head. The Medical Examiner testified that the head shot was at "contact range," killing Gracie "nearly instantaneously." Miller also shot Morris multiple times, hitting her neck, abdomen, chest, both legs, and right forearm.

Miller left the room after he stopped firing. Morris testified that she could not see where he was and could not hear whether he was nearby because her ears were "ringing" from the gunshots. Nevertheless, she "just took a chance" to look for her cell phone. When she first "went to go sit up," she was unable to, such that she "kind of thought [she] was paralyzed." She tried again and "sat up a little bit." She was able to reach her cell phone and call 911, but could not provide the address because she did not know it. After speaking with 911, she called other family members to tell them what happened and to ask them to call the police as well.

Police were able to trace Morris's call and arrived on scene in under five minutes. They found Morris lying on the floor "in a pool of blood" and Gracie sitting unresponsive on the couch with a pillow

7

on her face. Gracie was "deceased at the scene." Within roughly 10 minutes, police cleared the scene and EMTs took Morris to the hospital. Police discovered no weapons near the victims or anywhere else in the apartment.

After the shooting, Miller called his friend and neighbor Trina Brown. Brown testified that Miller walked over to her apartment to get a cigarette. He did not mention the incident. According to Brown, she and Miller drank a shot of alcohol and Miller waited there while Brown went to pick up her partner, Deonte Boulton, and Brown's adult daughter, Zarelle, from where they both worked. Brown testified that nothing appeared "out of the ordinary" with Miller, he looked like "normal . . . [j]ust like on any other day."

As Brown left her home, she saw police officers and helicopters in and around the apartment complex. When Brown returned with her family, she found Miller standing outside talking to two other neighbors about "all the commotion" because "somebody had got [sic] shot." When the State asked Boulton whether, at that point, Miller's behavior was "different from any other day," Boulton testified "not

really."

Brown testified that Miller and Boulton went back inside Brown's apartment to drink and smoke, and Brown followed a few minutes later. Miller, Boulton, and Brown all drank some more, with Brown testifying that she consumed about "4 or 5 shots" in approximately 30-45 minutes. Then all four of them – Miller, Brown, Boulton, and Zarelle – walked back to the Millers's apartment to "see what was going on."

As they approached the Millers's apartment, they found that police had "taped off" the area. Miller still said nothing to them about the incident, but Zarelle testified that she heard him say "I shot her" under his breath. Zarelle testified that she ignored the comment because she thought that Miller was drunk. When the group arrived at the scene, Miller approached Gwinnett police officer Brian Pierson and said "something to the effect of I just want to go home." Pierson confirmed with other officers that they were looking for Miller and police took him into custody on the spot.

Miller took the stand at trial. He testified that he and Morris

had a "good relationship" and there was "no bad energy whatsoever when she arrived." He likewise testified that he and Gracie "got along extremely well," that she was a caring person, and that their marriage was on good terms at the time of the shooting. He said that he and Gracie

> got along at times, but there – it was – it was times that we really got along extremely well. From the time that we once met each other, period, we got along. It was just like instantly, and bonding with family, instantly. But she was kind of on the stubborn side, so it would be iffy days, but nothing to the extreme.

He further testified that at the time of the shooting, as he entered the master bedroom when Gracie was braiding Morris's hair, he heard the women laughing, and then Gracie said, "that's why I'm leaving his a\*\*." Miller responded, "that's why I'm ready to go back to Alabama." Morris then said words to the effect "oh, sh\*t, let me get out the way . . . I'm not getting into sh\*t." Miller testified that as Morris said she would leave, Miller heard what sounded like a table sliding. He stepped back out of the bedroom. He says he saw Gracie "reaching with her right hand toward a pillow."

10

Miller testified that Gracie owned a gun that she would sometimes keep "in the living room on the small brown table." Miller testified that he had seen Gracie's gun that night on that table, which was "about a foot and a half" away from where Gracie was sitting as she said she would leave him. Miller also testified that he believed that at least one other gun, belonging to another family member, was somewhere in the vicinity, though he was not sure where. He says that as he heard Gracie's threat to leave him, he turned and saw her "reaching out . . . under the – pillow" where he thought a gun was hidden. He testified that he could "see something black in [Gracie's] hand."

In response to the alleged threat, Miller testified that he was able to "reach" into his bedroom and retrieve his gun with its extended ammunition clip. He opened fire as he entered the living room where Morris and Gracie were. After he killed Gracie, Miller testified that he fired on Morris because she was "making movement too," and there was a "pillow right there, so [he] didn't know what she was reaching for."

11

Prior to trial, the State filed a motion to admit evidence of two prior incidents between Miller and Gracie, occurring on November 15, 2017 (the "November 2017 incident"), and May 31,[2] 2018 (the "May 2018 incident"),[3] respectively. At the pretrial hearing on the motion, the State argued that these incidents demonstrated prior difficulties between Gracie and Miller, and were extrinsic bad acts as to Morris, and were thus admissible pursuant to Rule 404 (b).

The prosecutor explained that "no one knows" why Miller opened fire on his family that day, and further argued that

> I know that I don't have to prove motive in any murder proceeding. However, for me to be able to explain a way to the jury[,] a clear reason why a married man of X number of years with his wife[,] and both man and woman presumably old enough to act in a mature manner[,] how something like this could come, I wanted to make sure that I am able to paint the background, the circumstances of their marriage, as well as what happened relatively recently prior to show the state of their marriage, as well as the prior difficulty between the two.

---

[2] The State indicated at the pretrial hearing that the incident occurred on May 30, but at trial the testifying officer and the prosecutor referred to the date as May 31, pursuant to the relevant amended accusation.

[3] The State also sought admission of evidence regarding an April 8, 2018, incident, but abandoned that request at trial.

12

The State suggested that "if the Court's concerned about" how the prior difficulties would relate to the aggravated assault of Morris, "the Court can always give a limiting instruction or curative instruction" limiting the jury's consideration of those incidents to the context of Miller's attack on Gracie.

Miller's only objection was that the State could not prove that he committed the alleged acts because the only competent witness was Gracie, and her alleged statements in the prior incidents would be inadmissible hearsay. Counsel "concede[d] the point that if the State can get competent evidence that they can introduce this as a . . . prior difficulty."

The Court orally granted the State's motion, finding that "the evidence is being tendered for a purpose other than character, a proper motive – or a proper means for motive, nature of the relationship between the parties. The probative value is not substantially outweighed by the danger of unfair prejudice." A written order followed admitting the evidence of the prior incidents

13

to show "the circumstances immediately surrounding the charged crime, motive, and/or prior difficulties between the accused and the alleged victim under [Rule 404 (b)]."

At trial, before presentation of the State's evidence regarding the November 2017 incident, the trial court gave a limiting instruction to the jury, without objection.[4] Gwinnett County Police

---

[4] The court instructed as follows:

Ladies and gentlemen, with respect to the following testimony, sometimes evidence is admitted for a limited purpose. Such evidence may be considered by the jury for the sole issue or purpose for which the evidence is limited and not for any other purpose. In order to prove its case, the State may prove motive. To do so, the State has offered evidence of other acts allegedly committed by the accused. You are permitted to consider that evidence only insofar as it may relate to that issue and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes. The evidence may be considered only to the extent that it may show the issues that the State is authorized to prove, in the crimes charged in this case now on trial. Such evidence, if any, may not be considered by you for any other purpose. The defendant is on trial for the offenses charged in this bill of indictment only and not for any other acts, even though such acts may incidentally be criminal. Before you may consider any other alleged acts for the limited purposes stated, you must first determine whether it is more likely than not that the accused committed the other alleged acts. If so, then you must determine whether the acts shed any light on the issues for which the act was admitted in the crimes charged and the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence about other acts of the defendant. By giving this

14

Detective Steven Casey then testified that on November 15, 2017, when he was a patrol officer, he responded to a call about a domestic dispute involving Miller and Gracie at their apartment. He met Gracie and observed that "her lips were busted, and were also split open as well." The wounds appeared "freshly done." Detective Casey made contact with Miller "shortly afterwards" elsewhere in the apartment complex. The jury heard that Miller ultimately pleaded guilty to misdemeanor family violence battery pursuant to OCGA § 16-5-23.1 (f),[5] and that he was sentenced to serve 30 days in jail.

Regarding this incident, Miller testified at trial that he and Gracie had been "having an argument" and "kind of fussing," and that ultimately his wife threw a cup of bleach in his face. He testified that a friend of his called the police on his behalf, over his objection, to report the bleach attack. But when police arrived, they took Miller

instruction, the Court in no way suggests to you that the defendant has or has not committed any other acts, nor whether such acts, if committed, prove anything. This is solely a matter for your determination.

[5] The statute provides in pertinent part that "[i]f the offense of battery is committed between household members, it shall constitute the offense of family violence battery[.]" OCGA § 16-5-23.1 (f) (2).

into custody, despite him telling them about the bleach incident, because they were "looking for [him] anyway." Miller denied having anything to do with Gracie's "busted" lip, and said that he did not know how she received that injury. He contended that his guilty plea was the result of coercive circumstances, his attorney's unhelpfulness, and an unnamed witness's advice to plead guilty; in retrospect, it "bothered me to the point [sic] that I pled guilty to something I never did, and that was put my hands on my wife."

Prior to the State's submission of evidence regarding the May 2018 incident, the trial court reiterated its limiting instruction, again without objection.[6] The State then called City of Duluth Police Officer Rolf Seiferheld, who testified that on the day of the May 2018 incident, he responded twice to domestic calls involving Miller and Gracie. Officer Seiferheld testified that, the first time, officers came and went without incident. The second time, Officer Seiferheld encountered Gracie with "fresh" lacerations on her arms and saw

---

[6] The trial court initially told the jury that its limiting instruction applied to all "succeeding witnesses," but later clarified that the instruction only applied to the two officers testifying about the two prior incidents at issue here.

16

pieces of a shattered wine glass both in the living room and kitchen areas. Officer Seiferheld questioned Miller, who claimed that Gracie thought he was on the phone with another woman and that, in a fit of jealous rage, she broke the wine glass and cut herself to frame him for assault. Officer Seiferheld arrested Miller for simple battery domestic violence. The jury heard that Miller subsequently pleaded guilty to disorderly conduct pursuant to OCGA § 16-11-39 (a) (1)[7] and was sentenced to two days to serve.

Regarding this incident, Miller testified at trial that his wife heard him on the phone and was "irate." He said that she was "just picking, picking" at him so much that he called the police the first time. Miller testified that police spoke to him and Gracie and left with their dispute "resolved."

Miller testified that police came back for the second time that

_____

[7] This statute provides in pertinent part that "(a) A person commits the offense of disorderly conduct when such person commits any of the following: (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health[.]" OCGA § 16-11-39 (a) (1).

day because either Gracie or a neighbor called them. Miller testified that he was on the phone in the bedroom when he heard glass shattering. He says he came out of the room to find his wife "standing in the middle of the living room with a piece of glass in her hand. And she had cut herself from – close up here around the palm of her hand" to her right inner arm. By then police were already at the front door. He testified that police decided to arrest him as a "favor" to help keep him out of trouble.

During closing arguments, Miller's counsel argued that Miller acted in self-defense during the incident for which he was on trial and attempted to distinguish the two prior incidents. Counsel further argued that the May 2018 incident was "relatively minor" but that it gave the jury "some sort of glimpse into the relationship between the two parties and the nature of Gracie Miller." Counsel characterized that relationship as "tumultuous."

He also argued that "although the State is not required to prove motive, motive is always a relevant consideration." In that vein, counsel criticized the State's theory that Miller "for no reason

whatsoever or [that] for some unstated, unclear inarticulated [sic] reason decided, for whatever reason, on that day, to simply pull out a gun and start shooting." He further argued to the jury that the State's theory that Miller "comes out . . . does not say anything . . . offers no explanation or rationale . . . does not become upset . . . simply has a gun and starts shooting . . . does not make any damn sense" in the context of, among other things, Miller's "relationship" with Gracie.

In its charge to the jury, the trial court reiterated the limiting instruction it gave prior to introduction of the State's evidence of the two prior incidents. The trial court also charged the jury that

> [e]vidence of prior difficulties between the defendant and the alleged victim has been admitted for the sole purpose of illustrating, if it does, the state of feeling between the defendant and the alleged victim and witness. Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine, but you are not to consider such evidence for any other purpose.

Finally, the court charged that "[t]he State does not have to prove motive to prove murder. Any evidence of motive has been

19

admitted for your use in determining the defendant's state of mind at the time of the killing."

Miller only objected to the court's failure to charge Miller's preferred definition of "aforethought."

1. Miller argues that the prior incidents were inadmissible because he claimed self-defense. We disagree. The trial court did not err in admitting the evidence pursuant to Rule 404 (b), which says that

> [e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Id.

Proper admission of other-acts evidence pursuant to Rule 404 (b) requires the trial court to employ a three-part test, that

> (1) the other acts evidence is relevant to an issue other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice under OCGA § 24-4-403 ("Rule 403"), and (3) there is sufficient proof that a jury could find by a preponderance of the evidence that the defendant committed the acts.

20

*Flowers v. State,* 307 Ga. 618, 621 (2) (837 SE2d 824) (2020) (citation omitted).

As the State points out, Miller did not object below to introduction of the prior acts based on either relevance or the balance between probative value and undue prejudice. Thus, while he argues abuse of discretion, this Court reviews for plain error. See *Payne v. State,* 313 Ga. 218, 222 (1) (869 SE2d 395) (2022) (holding that failure to preserve an evidentiary objection for "ordinary appellate review" leaves the objection subject to review on appeal for plain error). See also *McKinney v. State,* 307 Ga. 129, 133 (2) (834 SE2d 741) (2019) (holding that failure to object on grounds of hearsay and a Confrontation Clause violation only preserves those two grounds for review for plain error).

> To show plain error, [Appellant] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Payne,* 313 Ga. at 222 (1) (citation omitted).

This Court need not analyze all the elements of plain error should Miller fail to prove any one of them. Id. (citation omitted).

(a) Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Miller argues that his claim of self-defense eliminated the need for evidence of motive, which rendered the other-acts evidence irrelevant. We disagree.

> Evidence of a defendant's prior acts toward another person may be admissible when the defendant is accused of a criminal act against that person, where the nature of the relationship between the defendant and the victim sheds light on the defendant's motive in committing the offense charged in the prosecution at issue.

*Flowers*, 307 Ga. at 621 (2) (citations and quotes omitted). See also *Lowe v. State*, 314 Ga. 788, 793 (2) (a) (879 SE2d 492) (2022) (same).

The two prior incidents were directly relevant to motive[8] in the context of Miller's relationship with Gracie, notwithstanding

---

[8] Miller argues both "motive" and "intent" in his appeal brief. However, the State did not offer, and the trial court did not admit, the prior incidents as evidence of intent, so we do not consider intent here.

22

Miller's claim of self-defense. See *Lowe*, 314 Ga.at 793 (2) (a) ("We have held that evidence of motive may be relevant to counter claims of . . . self-defense.") (citation omitted). Indeed, at the pretrial hearing defense counsel candidly "concede[d] the point that if the State can get competent evidence . . . they can introduce this as a . . . prior difficulty." The two incidents[9] give context to the question of why, based on the simple fact that Gracie said she was leaving Miller and he heard a table sliding, he says he instantly thought that she was reaching for a gun to kill him and, purportedly fearing for his life, he reached for his own gun, entered the room, fired repeatedly on his wife, and ultimately shot her in the head at close range. As he described it,

> when she came around – came around and she was getting up and she was already reaching, there was no doubt to me that she was – she was going to pull the gun and she was going to fire . . . there was no doubt that this

[9] At trial, Miller volunteered information about another incident not at issue in this appeal. He testified that he and Gracie had an argument wherein he threatened to leave Gracie and go back home to Alabama. He testified that she refused to let him leave and picked up a gun, firing it accidentally. Miller said Gracie then told her mom that he fired the shot. He could not give an approximate date for this incident. Trial counsel discussed this incident in opening statement as part of the basis for Miller's self-defense claim.

was the end of my life. I'm dead. I'm dead.

Presumably this is why defense counsel argued in closing that the May 2018 incident gave the jury "some sort of glimpse" into the Millers' relationship, and criticized what he characterized as the State's theory that Miller shot Gracie "for no reason whatsoever or [that] for some unstated, unclear inarticulated [sic] reason decided, for whatever reason, on that day, to simply pull out a gun and start shooting." Likewise, defense counsel told the jury that the idea that Miller just "comes out . . . does not say anything . . . offers no explanation or rationale . . . does not become upset . . . simply has a gun and starts shooting . . . does not make any damn sense" in the context of, among other things, Miller's previous relationship with Gracie. In that same vein, the State sought admission of these difficulties to help explain to the jury "how something like this could come" between a married couple, to "paint the background, the circumstances of their marriage . . . to show the state of their marriage," and to show "the prior difficulty between the two."

24

Thus, Miller fails to persuade us that admission of the prior incidents was error which was "clear and not open to reasonable dispute." *Payne*, 313 Ga. at 222 (1) (citation omitted). See *Flowers*, 307 Ga. at 621 (2) (holding that evidence that the appellant "beat[]" his wife eight days prior to shooting her "sheds light on the nature of the parties' relationship and on the appellant's potential motive in shooting [his wife] eight days later"). See also *Lowe*, 314 Ga. at 793 (2) (a) (concluding that where a husband was charged with murdering his wife, the trial court would have been within its discretion to admit evidence of the husband's prior abuse of his wife, which "would have been relevant as a prior difficulty to show motive").[10]

Finally, Miller relies on *Brown v. State*, 303 Ga. 158 (810 SE2d

---

[10] The concurrence argues that the State did not present any "logical connection" between the prior difficulties and Miller's motive. But the question is whether the prior difficulties were relevant to motive. See *Flowers*, 307 Ga. at 621 (2). "The test for relevance is generally a liberal one, and relevance is a binary concept -- evidence is relevant or it is not." *Harris v. State*, 314 Ga. 238, 262 (875 SE2d 659) (2022) (cleaned up). Here, as shown above, the State demonstrated that the prior difficulties evidence made it more likely that Miller shot Gracie because he thought that Gracie may have been attempting to commit violence on him as she had done in the past.

145) (2018) and *Strong v. State*, 309 Ga. 295 (845 SE2d 653) (2020) to support his argument that prior difficulties are irrelevant because he established his motive via his claim of self-defense. Those cases, however, are inapposite, because they address prior acts between a defendant and people other than their respective victims; they are not "prior difficulties" as here. See *Brown,* 303 Ga. at 160-161 (four counts of aggravated assault not involving the victim). See also *Strong*, 309 Ga. at 318 n.22 (holding that the admission of nine prior acts not involving the defendant and the victim was error, but noting that two other incidents involving the defendant and the victim "may have been admissible to show [the defendant] and [the victim's] relationship") (citing to *Flowers*, 307 Ga. at 621).

(b) Miller's argument that the undue prejudicial impact of the prior difficulties substantially outweighs their probative value likewise fails.

Rule 403 controls this analysis. See *Kirby v. State,* 304 Ga. 472, 480 (4) (819 SE2d 468) (2018) (holding that the second part of the test to admit evidence pursuant to Rule 404 (b) "is governed by" Rule

26

403). Rule 403 provides in pertinent part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

> The application of the Rule 403 test is a matter committed principally to the discretion of the trial courts, but as we have explained before, the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly. The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*Flowers*, 307 Ga. at 622-623 (citation omitted).

Again, while Miller argues abuse of discretion on appeal, his failure to object on this ground at trial subjects the issue to review for plain error. See *Huff v. State*, 315 Ga. 558, 566 (3) (883 SE2d 773) (2023) (reviewing for plain error because lack of objection pursuant to Rule 403 fails to "preserve for ordinary appellate review . . . that the testimony was improper character evidence, irrelevant, and inadmissible under [Rule 403]") (citation omitted).

Miller argues that the two other acts' probative value was so low that their undue prejudicial impact necessarily outweighed

27

their probative value. We disagree. First, the other acts at issue had significant probative value, as we just articulated. Second, Miller has not shown that the other acts give rise to undue prejudice. To the contrary, both other incidents were fairly minor, at least as compared to the deadly crimes at issue here. Thus, Miller has not shown that the other acts' prejudicial impact outweighs their probative value at all, much less substantially. See *Flowers*, 307 Ga. at 623 (citation omitted) (concluding that, where defendant was accused of murdering his wife, the prejudicial impact of evidence of his previously "beating" her did not outweigh its probative value because the prior abuse would not "shock the average juror or otherwise render the jury incapable of weighing the evidence in a disinterested manner") (citation omitted). This means that Miller has not shown plain error in the trial court's admission of this evidence pursuant to Rule 403, and, by extension, Rule 404 (b).

(c) Miller contends that the State failed to produce "sufficient proof for a jury to find by a preponderance of the evidence" that he caused the lacerations to Gracie's arm in the May 2018 incident, as

required to admit the evidence pursuant to Rule 404 (b). See *Flowers*, 307 Ga. at 621.[11] Specifically, Miller contends that the State only introduced his nolo contendere plea to the offense, but Georgia law generally prohibits the use of a nolo plea as evidence of a prior similar crime. See OCGA § 17-7-95 (c) ("Except as otherwise provided by law, a plea of nolo contendere shall not be used against the defendant in any other court or proceedings as an admission of guilt or otherwise or for any purpose."). Moreover, a nolo plea is explicitly hearsay without exception pursuant to OCGA § 24-8-803 (22) (granting a hearsay exception for "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty *but not upon a plea of nolo contendere*") (emphasis supplied). Thus, argues Miller, a nolo plea by itself fails to establish that Miller committed the prior act at issue.

Miller's argument fails because of the simple fact that, although the State referred to the plea as a nolo at the pretrial

---

[11] Miller does not raise this argument regarding the November 2017 incident.

hearing, the certified plea of record specifies that it was a "guilty" plea. Miller admitted at trial that he pleaded guilty to the charge associated with the May 2018 incident. Miller raised no contradictory evidence or argument at trial, and points to no contradictory evidence now, which means this argument fails.

Moreover, the plea was not the State's only evidence that Miller committed the act in question. Officer Seiferheld and Miller both testified that Miller and Gracie were involved in a domestic dispute on the day in question, with police responding to two calls at their residence. The evidence presented at trial indicates that either Miller or Gracie caused Gracie's wounds. A jury could conclude by a preponderance of the evidence that Miller did, particularly if it considered his explanation of the events as substantive evidence of his guilt. See, e.g., *Daughtie v. State*, 297 Ga. 261, 263-264 (2) (773 SE2d 263) (2015) (noting that in combination with other evidence, "a statement by a defendant, if disbelieved by the jury[,] may be considered as *substantive evidence* of the defendant's guilt) (citing *United States v. McCarrick*, 294 F3d 1286,

30

1293 (11th Cir. 2002) (emphasis in original)).

Thus, the plea itself was not the State's only evidence that Miller caused the lacerations at issue, and the State satisfied its obligation to produce "sufficient proof for a jury to find by a preponderance of the evidence" that Miller caused the lacerations to Gracie's arm in the May 2018 incident. This contention fails.

2. Miller next contends that admission of the other-acts evidence was error with respect to the assault against Morris because the court never explicitly ruled on the issue as to that crime. This means, argues Miller, that the court conducted no Rule 403 balancing test concerning those charges, as the law requires.

However, at the pretrial motion hearing, the State suggested that the trial court could give a limiting instruction to the jury if the court were "concerned" about how the prior acts might relate to the aggravated assault charge concerning Morris. The trial court immediately admitted the evidence to show motive and the "nature of the relationship between the parties," and found that "[t]he

31

probative value [wa]s not substantially outweighed by the danger of unfair prejudice."

Thus, the trial court implicitly considered the admissibility of the evidence of the other acts, including pursuant to the Rule 403 balancing test, regarding the assault against Morris. This defeats Miller's contention of error on this point. See *White v. State*, 319 Ga. 367, 380 (b) (i) (903 SE2d 891) (2024) (noting the trial court's "implicit conclusion that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence" pursuant to Rule 403). See also *Johnson v. State*, 312 Ga. 481, 494 (4) (863 SE2d 137) (2021) (concluding no error "in the trial court's implicit conclusion that the probative value of the . . . evidence was not substantially outweighed by its prejudicial effect"). See also *Brewner v. State*, 302 Ga. 6, 10 (II) (804 SE2d 94) (2017) (holding that while "[t]he trial court never did issue any express ruling on the 404 (b) motion," it "implicitly granted the motion by allowing [the evidence] at trial").

Miller also argues that the trial court abused its discretion by admitting the other acts pursuant to Rule 404 (b) as to the assault against Morris, because the acts were extrinsic as to her, and were too dissimilar from the shooting at hand to warrant their admission. Again, Miller did not raise this objection below, so this Court reviews for plain error. Assuming without deciding that admission of the prior incidents was error with respect to the assault against Morris, to be reversible, any such error must have also "affected [Miller's] substantial rights." *Payne*, 313 Ga. at 222 (citation omitted). Proving that admission of the evidence affected Miller's substantial rights requires him "to make an affirmative showing that the error probably did affect the outcome below." *Lupoe v. State*, 300 Ga. 233, 243 (4) (794 SE2d 67) (2016) (citation omitted).

Miller makes no such showing. To the contrary, Miller's justification for attacking Morris was exceedingly weak. Morris, an eyewitness to the murder, described the shooting in detail, and established the utter lack of provocation for Miller's opening fire that night. In addition, the record is devoid of evidence that Morris

and Miller had any problems prior to her visit. Indeed, Morris had never met Miller in person before the shooting. Morris testified that once she arrived, the visit began as "a very good time . . . [e]veryone was happy . . . [i]t was all good." Miller likewise testified that he and Morris had a "good relationship" and there was "no bad energy whatsoever when she arrived." The record only reflects tension between the two over whether Morris smoked marijuana inside the Miller residence despite his demand not to do so, which, even if true, does not justify shooting Morris. The *only* reason Miller offered for attacking Morris was that, after he shot Gracie, Morris was "making movement too," and there was a "pillow right there, so [he] didn't know what she was reaching for." Police, however, found no weapon near the victims or anywhere else in the apartment. Miller never claimed to see any more than something "black" in Gracie's hand, and never testified that he saw anything at all in Morris's hand.

After the killing, Miller admittedly sought no medical aid for the women and made no mention of the incident to his friends with whom he subsequently drank and smoked, despite all the

"commotion" in the complex as police, including in helicopters, investigated the murder. Thus, the State's case with respect to Miller's unjustified killing of Morris was very strong and, conversely, Miller's evidence of justification was so weak it was virtually non-existent.

Compared to that evidence, the two relatively minor incidents from several years earlier, which did not involve deadly force or even serious injury, were unlikely to sway the jury against Miller. This is particularly so because Miller testified about the other incidents himself and cast Gracie as the one at fault, just as he did in this case. Moreover, the trial court's reiterated limiting instructions reminded the jury that it was not to consider Miller's character, and that Miller was only on trial for the crimes under indictment. "We ordinarily presume that jurors follow their instructions." *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020). And the jury heard that Miller had already served time in jail for the two prior incidents. This "reduces the risk that the jury convicted [Miller] to punish him for his other crimes," because the jury heard that Miller,

35

by his own testimony, "had already been punished for those crimes." *Nundra v. State*, 316 Ga. 1, 8 (2) 885 SE2d 790 (2023). Finally, the State only presented two brief other-acts witnesses and made only limited reference to the prior acts in its closing argument, which further mitigates any undue prejudice on the jury.[12]

Thus, Miller makes no "affirmative showing" that any presumed error in the admission of the prior incidents "probably did affect the outcome below," *Lupoe*, 300 Ga. at 244, and this argument fails. See, e.g., *Ruthenberg v. State*, 317 Ga. 227, 231 (2) (892 SE2d 728) (2023) (holding that admission of three prior misdemeanor convictions pursuant to OCGA § 24-4-418 was not plain error given overwhelming evidence of defendant's guilt).

Based on the foregoing, we affirm.

*Judgment affirmed. All the Justices concur, except Boggs, C.J., Peterson, P.J., Warren and Pinson, JJ., who concur specially, and Bethel, J., who concurs in judgment only.*

---

[12] Defense counsel argued to the jury that the May 2018 incident was "a relatively minor fact in this case, because who's fooling who? That's not what Mr. Miller is on trial for."

36

PINSON, Justice, concurring specially.

I agree with much of the majority opinion, but I would reject Miller's claim of plain error related to the evidence of "prior difficulties" because any error in admitting that evidence did not affect Miller's substantial rights.

In my view, reasonable minds can differ about whether the evidence of prior difficulties was properly admitted. "Prior difficulties" evidence was broadly admissible under our old Evidence Code, to make vague showings like "course of conduct" and the defendant's "bent of mind." See, e.g., *State v. Burke*, 287 Ga. 377, 377-378 (695 SE2d 649) (2010). But such evidence is properly excluded under our new Evidence Code if it merely shows the "nature of the relationship" (for example) without some logical connection to the crime through motive or some other non-propensity purpose under Rule 404 (b). See *Payne v. State*, 313 Ga. 218, 222 (1) (869 SE2d 395) (2022) (evidence of prior difficulties may be admissible "where the nature of the relationship between the defendant and the victim *sheds light on the defendant's motive* in

37

committing the offense charged" (quoting *Flowers v. State*, 307 Ga. 618, 621 (2) (837 SE2d 824) (2020)) (emphasis added))).[13] That seems like a fair description of the "prior difficulties" evidence here. Motive, we have said, is "the reason that nudges the will and prods the mind to indulge the criminal intent." *Harris v. State*, 314 Ga. 238, 270 (3) (e) (875 SE2d 659) (2022) (citation and punctuation omitted). But here the State described the prior difficulties evidence merely as "paint[ing] the background" and "show[ing] the state of their marriage," and did not tie it to a specific motive or reason for the charged crime of murder. See id. at 270-271 (3) (e). We have cautioned that improper arguments focusing on a defendant's propensity and bad character may "masquerad[e]" as purported motives that lack the necessary "specific, logical link" to the charged crime, see id., and I am concerned that the evidence of prior difficulties here might have made it into the trial in just that

---

[13] A couple of our decisions might be read to suggest that prior difficulties evidence is admissible without some logical connection to motive or some other non-propensity purpose under Rule 404 (b). I disagree that such a reading is the appropriate interpretation of Rule 404 (b).

fashion.

But we need not decide whether the trial court made a clear and obvious error in not excluding that evidence, because it is quite clear that any error did not affect Miller's substantial rights. There was only one eyewitness, Morris, who described in detail how Miller had shot her and Gracie. Morris knew Miller well and had no reason to lie. On the other side was only Miller's self-serving claim that he thought Gracie had a gun. Compared to that evidence, the two incidents from years earlier, which did not involve deadly force or even any serious injuries, were highly unlikely to sway the jury against him. That is particularly so because Miller testified about the incidents himself and cast Gracie as partly to blame — and indeed, Miller's counsel alluded to the prior incidents in his closing argument, to the effect that they showed Miller and Gracie had a tumultuous relationship and that it might have been reasonable for Miller to think he needed to defend himself. In that sense, the prior incidents may have *helped* Miller more than hurt him. So admitting the prior difficulties evidence was highly unlikely to have changed

the outcome of Miller's trial.

Because the decisions of this Court are precedent that is binding on every one of the hundreds of courts across our State, we have generally favored reaching consensus over issuing a split decision on a closer question. Because we would almost certainly reach consensus on the conclusion that any error in admitting the evidence of prior difficulties did not affect Miller's substantial rights, I would do that here. As a result, I concur in the judgment and join the Court's opinion except for Division 1.

I am authorized to state that Chief Justice Boggs, Presiding Justice Peterson, and Justice Warren join this concurrence.