319 Ga. 78
FINAL COPY

S24A0170. HUBER v. THE STATE.

MᴄMɪʟʟɪᴀɴ, Justice.

Appellant Andrew Thomas Huber was convicted of felony murder predicated on aggravated assault in relation to the shooting death of Daniel Raburn.[1] On appeal, Huber argues that the evidence was insufficient to support his felony murder conviction, his trial counsel rendered ineffective assistance on various grounds, and the

---

[1] Raburn died on July 3, 2020. On May 28, 2021, a Laurens County grand jury indicted Huber, as a party to the crimes, for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and three counts of aggravated assault against Raburn (Counts 3-5). Huber's accomplices Thomas Wayne Harper and Brandilee Nicole Woodard-Brady were separately indicted on the same charges. Prior to Huber's trial, Harper was tried and convicted of voluntary manslaughter and aggravated assault, and Woodard-Brady entered a guilty plea to voluntary manslaughter. At a trial from October 4 through 7, 2022, a jury found Huber not guilty of malice murder but guilty of all the remaining counts against him. The trial court sentenced Huber to life in prison without the possibility of parole for felony murder; the aggravated assault counts were merged for sentencing purposes.

Huber filed a timely motion for new trial on October 28, 2022, which was thrice amended by new counsel on May 8, May 31, and June 9, 2023. Following a hearing on May 30, 2023, the trial court denied Huber's motion for new trial, as amended, on August 3, 2023. Huber filed a timely notice of appeal on August 24, 2023, and the case was docketed to the term of this Court beginning in December 2023 and thereafter submitted for a decision on the briefs.

trial court committed plain error in instructing the jury on simple assault and voluntary manslaughter. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that Huber had been friends with Brandilee Woodard-Brady for many years and was temporarily living with her and her fiancé, Raburn. Raburn and Woodard-Brady's relationship was "rocky" and "toxic," and she had previously gotten a temporary protective order against him but later had it rescinded. Thomas Harper was a mutual friend of Huber and Woodard-Brady, and Harper had also occasionally spent time with Raburn but "didn't really know" him. On July 4, 2020, law enforcement officers arrived at Raburn and Woodard-Brady's house for a welfare check, where officers found Raburn's body lying in the yard with multiple lacerations and abrasions and a gunshot wound to the head. Police contacted Woodard-Brady that same day and questioned her at the police station.

At the interview, Woodard-Brady told police that she "didn't

know what had happened." Detectives later questioned Woodard-Brady again at her sister's house, and at that point, she admitted that she knew Huber and Harper had beat up Raburn but said "they wasn't supposed to kill him." After Woodard-Brady was arrested, she asked to speak to a detective again, and at that point, she admitted that she had asked Huber and Harper over to the house to "beat [Raburn's] a**." When police arrested Harper, they found a gun at his residence, and Harper admitted at trial that he shot Raburn with it. And when police arrested Huber and processed his car, they found bloody clothes behind a speaker, and he admitted that the bloody clothes were the clothes he was wearing when Raburn was shot. DNA analysis revealed that the blood on Huber's clothes belonged to Raburn.

At trial, Woodard-Brady testified that on July 3, 2020, she and Raburn got into a verbal altercation at their home and he pushed her, so she texted Huber, "[b]eat his a**," after which, Huber and Harper came to the house. According to Woodard-Brady, she remained in the house, but she saw Huber and Harper pull up,

3

heard "noises," and "figured that [Huber and Harper] were beating [Raburn] up." She also stated that though she called Huber and Harper over to beat up Raburn, she "wasn't expecting them to go to that extreme." She testified that after the beating, she went outside long enough to see Raburn lying on the ground and that "I thought he had just — that he was either knocked out or passed out, I did not know that he had been shot and killed." She testified that after Huber and Harper left, she also left and went to a friend's house to stay the night and that she never checked on Raburn or called 911. According to her friend, when Woodard-Brady arrived, Woodard-Brady immediately began drinking tequila from the bottle and asked her friend to punch her in the face so that she had an alibi. Woodard-Brady also admitted on direct examination that she had pleaded guilty to voluntary manslaughter in relation to Raburn's death. On cross-examination, Huber's counsel elicited testimony from Woodard-Brady that she regularly abused alcohol and drugs, and that her "story changed each time" she talked to the police.

Harper testified that Woodard-Brady never contacted him to

come over and beat up Raburn. According to Harper, when he and Huber arrived at Raburn and Woodard-Brady's house, Raburn was holding a wrench and Huber got out of the car and "exchanged words" with Raburn before Raburn told Huber to "get that n****r out of his yard," which angered Harper, who exited the car. Raburn then dropped the wrench and "got into an altercation" with Huber, and the two men fought on the ground before Raburn got up, "rushed" Harper, and tackled him, causing Harper's gun to fall out of his pocket. Harper said that he and Raburn then fought with each other and "tussled over the gun" before Harper gained control of it and shot Raburn as Raburn continued to hurl racial slurs at Harper; Huber then drove Harper away. Harper further testified that although Harper shot Raburn, Harper did not cause any other "lacerations" or "indentations" on Raburn's head, so Huber must have caused those injuries.

Huber also testified at trial. According to Huber, on July 3, Woodard-Brady texted him that Raburn was "acting unusual," so he told her he would come by and "check on them." Huber drove Harper

to the house, and they went inside to speak with Woodard-Brady before Huber walked back outside to talk to Raburn; Huber described Raburn as "fine." So, Huber went back inside, where he saw Woodard-Brady and Harper kissing. Huber and Harper then left, but later that day, Woodard-Brady called Huber, crying, causing Huber to drive back to the house with Harper.

According to Huber, when he and Harper arrived back at the house, Raburn was sitting in his car drinking a beer, and after he saw them pull up, he got out of his car while holding a tire iron and at one point, yelled, "[g]et that n****r out of my yard." Huber and Harper got out of Huber's car, and a verbal altercation began between Harper and Raburn. Harper asked Raburn why he would need the tire iron, and Raburn said he didn't and threw it down. Huber testified that after he noticed Raburn and Harper were "getting more heated," Huber approached Raburn, and Huber and Raburn began "tussl[ing]" and "rolled around in the grass," as Raburn was "trying to put [Huber] in a headlock." Huber said that he and Raburn "broke apart," Raburn "calmed down a little bit," and

Huber began to walk away, but as he walked toward his car, Huber heard a "clink" and "froze" because he thought it might be somebody getting hit with a bottle and it scared him. Huber testified that "[a]fter that, out of my peripheral, I could see that Raburn stumbled for, like, a second and then he turned around and rushed Harper" and "got Harper on his back." According to Huber, "they were struggling over something in their hands," and Harper yelled "get him off of me, get him off of me," so Huber grabbed Raburn and pulled him off Harper. Huber testified that he then walked back to his car, and that was when he heard a gunshot.[2] Harper then ran toward the car and told Huber to "get the F in the car," so they both got in, and Huber drove them away. As Huber drove them away, Harper said "lights out" and told him "[t]he same thing could happen to [Huber]." Huber dropped Harper off and did not go back to Raburn and Woodard-Brady's house. Neither Huber, Harper, nor Woodard-Brady called 911 for help or to report the incident.

A neighbor who was in her home at the time of the incident

---

[2] Huber testified that Harper "always toted a gun."

7

testified that she heard voices arguing, including a man yelling "b***h, did you call me a n****r," followed by a loud noise, then a woman screaming, and finally a car driving away.

1.  Huber contends that the evidence presented at trial was insufficient to support his conviction for felony murder predicated on aggravated assault. We disagree.

When this Court evaluates the constitutional sufficiency of the evidence, "we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, enabled the jury to find the defendant guilty beyond a reasonable doubt of the crimes of which [he] was convicted." *Fitts v. State*, 312 Ga. 134, 141 (3) (859 SE2d 79) (2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Muse v. State*, 316 Ga. 639, 647 (2) (889 SE2d 885) (2023) (citation and punctuation omitted).

"A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "Felony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony — in this case, aggravated assault, which also does not require intent to kill." *Mathews v. State*, 314 Ga. 360, 365 (1) (877 SE2d 188) (2022) (citation and punctuation omitted). Under the relevant part of Georgia's aggravated assault statute, "[a] person commits the offense of aggravated assault when he or she assaults: . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (a) (2).

OCGA § 16-2-20 (a) provides that "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." To obtain a conviction of a person as a party to the crime, the State must prove "that he intentionally aided or abetted in the commission of the

9

crimes or intentionally advised, encouraged, counseled, or procured someone else to commit the crimes." *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020). "Conviction as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." *Rooks v. State*, 317 Ga. 743, 751 (2) (893 SE2d 899) (2023) (citation and punctuation omitted).

Thus, to prove Huber guilty of the charge of felony murder predicated on aggravated assault, it was not necessary for the State to prove that he personally hit, kicked, or shot Raburn so long as the State proved that Huber was a party to the crimes. See *Scoggins v. State*, 317 Ga. 832, 836-39 (1) (a)-(b) (896 SE2d 476) (2023) (even where evidence did not conclusively establish which of two defendants shot victim or had a weapon, evidence of a common criminal intent, including defendant's presence, companionship, and conduct before and after the fatal shooting supported conviction as a party to the crime of murder).

Here, the evidence showed that Woodard-Brady texted Huber to come "beat [Raburn's] a\*\*" and that Huber then came to the house. Huber also admitted at trial that Woodard-Brady had requested Huber to come over and that she was crying, that Huber drove Harper (whom Huber knew to always carry a gun) to the house, and that Huber and Harper both engaged in a physical fight with Raburn once they arrived. Moreover, Huber admitted that he aided Harper during Harper's fight with Raburn. And after Harper shot and killed Raburn, Huber drove Harper away and never called 911. Huber's clothes were also covered with Raburn's blood despite Huber's claim that he was not near Raburn when Harper shot him. Thus, the evidence supported Huber's presence and active participation before, during, and after the crimes.

We conclude that this evidence, when viewed in the light most favorable to the jury's verdict, was sufficient as a matter of constitutional due process to support Huber's conviction for felony murder predicated on aggravated assault, at least as a party to the crimes. See, e.g., *Harris v. State*, 312 Ga. 602, 604-05 (2) (864 SE2d

11

31) (2021) ("even if someone else fired the fatal shot, it is clear that [a]ppellant and that individual joined in the attack on the victim," and the jury was authorized to conclude that appellant was at least a party to the crime of felony murder predicated on aggravated assault (citation and punctuation omitted)); *Griffin v. State*, 292 Ga. 321, 322 (1) (737 SE2d 682) (2013) ("Although [appellant] argues his admission that he hit [victim] was insufficient to convict him of felony murder based on an aggravated assault, there was evidence from which the jury was authorized to determine that he either directly participated in or was a party to a crime of aggravated assault which caused the death of another."); *Ellis v. State*, 292 Ga. 276, 279 (1) (736 SE2d 412) (2013) (evidence was sufficient to support appellant's conviction as a party to the crime of felony murder predicated on aggravated assault where "[e]ven if [appellant] did not have the specific intent that [victim] be killed, the crimes which he did intend were dangerous ones; by their attendant circumstances, they created a foreseeable risk of death." (citation and punctuation omitted)). Accordingly, this enumeration

of error fails.

2. Huber also contends that his trial counsel rendered ineffective assistance (a) by failing to request an instruction that in assessing witness credibility, the jury was authorized to consider negotiated pleas, leniency, or similar matters, or to request an instruction on impeachment concerning a witness's bias or motive; and (b) by failing, on his cross-examination of Woodard-Brady, to adduce evidence about the sentence she received in exchange for her guilty plea to voluntary manslaughter, the maximum sentence she avoided, and the dismissal of the other counts against her. These claims fail.

To succeed on a claim of ineffective assistance of counsel, Huber must show both that his counsel's performance was deficient and that such deficiency prejudiced his defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, Huber must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing

13

professional norms." *Bacon v. State*, 316 Ga. 234, 239 (3) (887 SE2d 263) (2023) (citation and punctuation omitted). In doing so, Huber must overcome "[a] strong presumption . . . that trial counsel's performance was reasonable and that counsel's decisions and choices at trial fell within the broad range of professional conduct as assessed from counsel's perspective at the time of trial and under the specific circumstances of the case." Id. (citation and punctuation omitted). To establish prejudice, Huber "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022). And if Huber fails to make a sufficient showing on either the deficiency or the prejudice prong, we need not address the other prong. See *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022).

(a) *Failure to Request Jury Instructions*. Huber argues that his trial counsel rendered ineffective assistance by failing to request the pattern jury instruction: "In assessing the credibility of a witness, you may consider any possible motive in testifying, if shown. In that

regard you are authorized to consider any possible pending prosecutions, negotiated pleas, grants of immunity or leniency, or similar matters." Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.31.80. Separately, Huber argues that his trial counsel rendered ineffective assistance by failing to request a jury charge on impeachment concerning a witness's bias or motive.

But the trial court gave the suggested pattern jury instructions on credibility of witnesses; witness, attacked; witness, impeached; prior statements; single witness; accomplice corroboration; presumption of innocence; the State's burden of proof; mere presence; and grave suspicion — including that in deciding witness credibility,

> you may consider all of the facts and circumstances of the case, including the witnesses' manner of testifying, their means and opportunity of knowing the facts about which they testify, the nature of the facts about which they testify, the probability or improbability of a testimony, their interest or lack of interest in the outcome of the case, and their personal creditability [sic] as you observe it.

See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.31.10. Because we have held that these instructions

15

adequately covered the concept set out in Pattern Instruction §

1.31.80, the failure to request that charge is not deficient. See

*Perkins v. State*, 313 Ga. 885, 902 (5) (a) (873 SE2d 185) (2022)

("[T]he trial court adequately covered [Pattern Instruction § 1.31.80]

in the instructions it gave the jury on witness credibility and

impeachment."). Similarly, we have held that the instructions given

by the trial court sufficiently covered the concept of impeachment by

showing bias or motive. See *Lee v. State*, 281 Ga. 776, 777-78 (3) (642

SE2d 835) (2007) (trial court's instruction that the jury is "the

arbiter of each witness's credibility and that it should give

consideration to each witness's interest or lack thereof in the

outcome of the case . . . adequately covered the possible motive,

interest, or bias of the State's witnesses," and therefore "trial

counsel did not render ineffective assistance by failing to request an

additional instruction").

Huber argues on appeal that *Lee* and its progeny should be

overruled. But this argument does not support his ineffective

assistance claim since "there is no general duty on the part of

defense counsel to anticipate changes in the law." *Williams v. Rudolph*, 298 Ga. 86, 89 (777 SE2d 472) (2015) (citation and punctuation omitted). Accordingly, Huber has not shown that his counsel was deficient in this respect, and this claim fails.

(b) *Cross-Examination of Woodard-Brady*. Huber acknowledges that the jury heard evidence that Woodard-Brady pleaded guilty to voluntary manslaughter but argues that his trial counsel rendered ineffective assistance by failing, on his cross-examination of Woodard-Brady, to adduce evidence about the sentence she received in exchange for her guilty plea, the maximum sentence she avoided for murder and three counts of aggravated assault, and the dismissal of those counts, which Huber contends was relevant to Woodard-Brady's bias and motive to testify against Huber.

Pretermitting whether counsel was deficient in failing to elicit the penalties that Woodard-Brady faced before pleading guilty, we conclude that Huber has not met his burden of demonstrating that he was prejudiced by the alleged deficiency. The evidence against

17

Huber was strong. Huber admitted at trial that he went over to Woodard-Brady's house on the day of the murder, that Huber and Harper together fought Raburn, that Harper asked Huber to help him pull Raburn off him during the fight, and that subsequently Harper shot Raburn. Even though Huber claimed to have walked away and been by his car at the time of the shooting, Raburn's blood was found on Huber's clothes. In contrast, although Woodard-Brady claimed that she asked Huber to come over to beat Raburn, she also testified that she did not witness the fight or the shooting.

Also, counsel attempted to impeach Woodard-Brady's credibility. As recognized by the trial court, the jury heard that Woodard-Brady pleaded guilty to voluntary manslaughter in connection with her role in the shooting. Moreover, Woodard-Brady acknowledged on direct examination that she "lied by omission," and Huber's trial counsel further cross-examined her on that point by having her admit on the stand that her "story changed each time" she talked to the police. Given the foregoing, Huber has not established a reasonable probability that but for counsel's failure to

further impeach Woodard-Brady by eliciting information about the penalties that Woodard-Brady avoided by pleading guilty, the result of his trial would have been different. See, e.g., *Benton v. Hines*, 306 Ga. 722, 725 (2) (832 SE2d 801) (2019) (counsel's failure to elicit evidence of witness's maximum possible sentence did not prejudice defendant where jury heard other details of witness's plea deal, and witness's testimony was corroborated by other evidence, including defendant's own incriminating statement); *McCoy v. State*, 303 Ga. 141, 143 (2) (810 SE2d 487) (2018) ("In light of the strong evidence of guilt, there is no reasonable probability that the outcome of the trial would have been different had trial counsel utilized alternative impeachment evidence."). This claim therefore fails.

3. Conceding that his trial counsel did not object to the trial court's jury instructions on simple assault (as an element of aggravated assault) and voluntary manslaughter, Huber contends that the trial court plainly erred in its instructions to the jury on these legal principles. See OCGA § 17-8-58 (b) ("Failure to object in accordance with subsection (a) of this Code section shall preclude

appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section."). Huber's claims fail.

To show plain error, Huber "must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this standard is difficult, as it should be." *Rice v. State*, 311 Ga. 620, 623 (1) (857 SE2d 230) (2021) (citation and punctuation omitted). And this Court does not have to analyze all elements of the plain-error test where an appellant fails to establish any one of them. See *Lewis v. State*, 311 Ga. 650, 665 (4) (859 SE2d 1) (2021).

(a) *Simple Assault*. As part of its instruction on aggravated assault, the trial court instructed the jury on simple assault, stating: "To prove assault, the State does not have to prove that the other

20

person was actually injured. However, the State must prove that the defendant attempted to cause a violent injury to the person and/or committed an act that placed the person in reasonable apprehension or fear of immediately receiving a violent injury." Although not entirely clear, Huber seems to argue that based on the allegations of the indictment, the trial court should have only instructed the jury on simple assault under OCGA § 16-5-20 (a) (1), which provides that a person commits the offense of simple assault when he "[a]ttempts to commit a violent injury to the person of another," such that the trial court's additional charge defining an assault as an action that places "the person in reasonable apprehension or fear of immediately receiving a violent injury" misstated the law.

However, Huber was charged with aggravated assault by attempting to commit a violent injury in Counts 3 and 4 and with aggravated assault by committing an act which places another in reasonable apprehension of receiving a violent injury in Count 5,[3] so

---

[3] Regarding the aggravated assault counts of Huber's indictment, Count 3 charged him with "mak[ing] an assault upon the person of Daniel Hugh

21

the trial court properly gave the suggested pattern jury instructions concerning assault based on the allegations and evidence presented in the case. See OCGA § 16-5-20 (a) ("A person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury."); Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 2.20.21 ("For aggravated assault, the State must prove that the Defendant: 1. assaulted another person 2. (with a deadly weapon) (with an offensive weapon). To prove assault, the State does not have to prove that the other person was actually injured. However, the State must prove that the Defendant (attempted to cause a violent injury to the person) (committed an act

---

Raburn with a firearm, a deadly weapon in the manner used, by intentionally shooting said victim in an attempt to commit a violent injury upon said person"; Count 4 charged Huber with "mak[ing] an assault upon the person of Daniel Hugh Raburn with the hands and feet of said accused, deadly weapons in the manner used, by intentionally striking said victim in an attempt to commit a violent injury upon said person"; and Count 5 charged Huber with "mak[ing] an assault upon the person of Daniel Hugh Raburn with the hands and feet of said accused, deadly weapons in the manner used, by placing the said victim in reasonable apprehension of receiving a violent injury by intentionally striking said victim."

that placed the person in reasonable apprehension or fear of immediately receiving a violent injury).")). There was no error, plain or otherwise, and Huber's argument fails.

(b) *Voluntary Manslaughter.* Huber argues that the jury charge on voluntary manslaughter was plain error because by referring only to "the defendant," the trial court failed to also instruct the jury that Harper could have been provoked by Raburn's words to a sudden, violent, and irresistible passion and if Harper was so provoked, Huber would have been also because Huber had been charged as a party to the crimes.

However, not only did the trial court instruct the jury on voluntary manslaughter at Huber's request, it gave the charge requested by Huber—which was the suggested pattern jury instruction and which referred to "the defendant," rather than "Harper"—verbatim. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases §§ 2.10.40-42. And when an appellant has invited an alleged error, it constitutes an affirmative waiver under plain-error review, thus providing no basis for

23

reversal. *Shank v. State*, 290 Ga. 844, 845 (2) (725 SE2d 246) (2012); see also *Vasquez v. State*, 306 Ga. 216, 229 (2) (c) (830 SE2d 143) (2019) ("An affirmative waiver may occur, for example, when a defendant . . . explicitly requests a jury instruction that he later argues on appeal should not have been given."); *Shaw v. State*, 292 Ga. 871, 873 (2) n.3 (742 SE2d 707) (2013) (under plain error review, "reversal is not warranted if the error was invited by the appellant"). Huber's claim therefore fails at the first prong of the plain error test.

*Judgment affirmed. All the Justices concur.*

Decided April 30, 2024 — Reconsideration denied May 29, 2024.

Murder. Laurens Superior Court. Before Judge Green.

*Frances C. Kuo*, for appellant.

*L. Craig Fraser, District Attorney, Cheryl B. Hightower, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellee.