NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 16, 2025

S25A0840. FELTON v. THE STATE.

LaGrua, Justice.

Appellant Joseph A. Felton appeals his convictions for malice murder and other crimes related to the beating and stabbing death of his wife, Sheray Felton.[1] On appeal, Felton argues that his convictions should be reversed based on the following contentions: (1) Felton's trial counsel was constitutionally ineffective for failing to request a jury charge on impeachment based on a witness's bias

---

[1] Sheray was killed on or about March 13 to 15, 2014. On July 7, 2016, a Henry County grand jury indicted Felton for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); and aggravated assault (Count 3). Felton was tried from August 2 to 12, 2021, and the jury found Felton guilty on all counts. The trial court sentenced Felton to life without the possibility of parole on Count 1 (malice murder), and the remaining counts merged or were vacated by operation of law. Felton filed a timely motion for new trial, which he later amended through new counsel multiple times. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on December 11, 2024. Felton filed a timely notice of appeal, and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

for or against a party; (2) in four different instances at trial, the trial court plainly erred by allowing witnesses to testify about testing performed by other individuals and by allowing the admission of the non-testifying individuals' reports through these witnesses in violation of Felton's rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution; (3) the trial court plainly erred in permitting the State to introduce evidence of multiple knives found in Felton's car at the time of his arrest because the State failed to show a connection between the knives and Sheray's death; and (4) the cumulative harm of trial counsel's deficiency and the trial court's errors requires reversal. For the reasons that follow, we affirm Felton's convictions and sentences.

The evidence presented at trial demonstrates that, on the night of March 14, 2014, Rosanna Mays, Sheray's mother, and Josten Mays, Sheray's 20-year-old son, who lived in the Chicago area, were scheduled to fly from Chicago to Atlanta to visit Sheray. Rosanna spoke to Sheray around 8:00 p.m. on March 13 — the night before the scheduled trip — and Sheray sounded "fine." At 5:00 a.m. the next morning, Felton called Rosanna and told her that "Sheray was sick"; that he "had taken [Sheray] to the hospital"; and that they had returned home. Rosanna asked to speak to Sheray, and Felton told her that "Sheray was sleeping." A couple hours later, Felton called Rosanna again, and when Rosanna asked to speak with Sheray, Felton told her Sheray was still "resting." Around 11:30 a.m. on March 14, Rosanna received another call from Felton, and this time, he sounded "very angry and upset" and "was cursing." Felton told Rosanna he had "looked in Sheray's email" and "believed that Sheray had a boyfriend" and was cheating on him. Rosanna assured Felton that Sheray loved him and tried to calm him down, and Felton said he "would kill Sheray" if "she got a man" and hung up the phone.[2]

Before leaving for Atlanta on the night of March 14, Rosanna

and Josten tried to reach Sheray, but she did not answer her phone

---

[2] At trial, Rosanna testified that this kind of jealous behavior was not out of character for Felton. The record reflects that Sheray and Felton grew up in the Chicago area and dated briefly in high school. After reconnecting in 2011, Sheray and Felton were married and lived in Chicago. In 2013, Sheray moved to Georgia. At the time, Felton did not move with Sheray because the two were separated, but he later followed her to Georgia in late 2013. Rosanna testified that, when Sheray and Felton got back together "as adults," Felton "was very controlling," "clingy," "jealous," and "aggressive." Additionally, Rosanna and Josten testified that they had observed Felton act violently towards Sheray and that he seemed "obsessed" with Sheray, calling her "constantly," getting angry and jealous when she socialized or spent time with any other men — including Josten and other family members — and damaging

3

or respond to text messages. Rosanna and Josten landed at the Atlanta airport around midnight on March 14, and while they were "expecting to see [Sheray]," she was not there to meet them and did not answer her phone, which increased their concern "that something had happened" to her.[3] They rented a car at the airport and drove to the house Sheray shared with Felton in Henry County (the "Felton residence"), arriving between 3:00 and 4:00 a.m. on March 15. Rosanna and Josten rang the doorbell and knocked on the front and back doors, but no one answered. They also noted that Sheray's two dogs — who usually had "free reign [sic] of the house" and would start "barking" and "jumping up on the door" when someone came to the house — were not by the door. Instead, the dogs were "whining" somewhere inside the house. After noting that all the doors to the house were locked, Rosanna called the police to

---

or destroying any of Sheray's clothes that he thought were too "provocative." One of Felton's co-workers, who often drove Felton to work, testified that Felton had a "fixation" with Sheray and that she was "all he talked about."

[3] Rosanna testified that she spoke with Sheray "on a daily basis," so her inability to reach Sheray on March 14 was very concerning. Josten similarly testified that he spoke to Sheray "every day," and he had never gone "that long without being able to contact her."

request a welfare check. A police officer arrived around 5:00 a.m., and after checking the house, knocking on the doors, and observing no signs of forced entry anywhere, he advised Rosanna and Josten that he would need to wait "24 hours" prior to entering the home.

Rosanna and Josten waited in the car and continued trying to reach Sheray. While they were waiting, Rosanna received a call from Felton, who said he had "been checking on [Sheray] throughout the night" and she was "fine." He also said he was at work, but evidence introduced at trial from his employer DHL showed that he had not shown up for his 6:00 a.m. to 6:00 p.m. scheduled shifts on March 14, 15, and 16. Rosanna asked Felton to please hurry to the house, explaining that she and Josten had been there "all night trying to get in the house" and "Sheray ha[d]n't answered the door." Felton said he would be home in 15 or 20 minutes. About an hour and a half later, when Felton still had not shown up, Rosanna "called law enforcement again."

Henry County Police Officer Geoffrey Gravius arrived at the Felton residence around 11:30 a.m. on March 15. Officer Gravius

testified that he was already familiar with this residence because he had previously been dispatched there on January 1, 2014 in response to "a 911 hang up." According to Officer Gravius, on January 1, he and another police officer arrived at the Felton residence, and after knocking on the door and ringing the doorbell multiple times, they eventually made contact with Sheray, who called for help from an upstairs window. The officers learned that Sheray had attempted to call 911 following a physical altercation with Felton, who prevented her from completing the call and hid the telephone from her. The officers observed "a visible bruise . . . on [Sheray's] right forearm" and "a small injury to her bottom lip," which Sheray said occurred when Felton "shov[ed]" a pair of shorts "into her mouth." The officers observed no visible injuries to Felton.

On March 15, when Officer Gravius arrived at the Felton residence, Rosanna and Josten explained their concerns about Sheray, and Officer Gravius attempted to make contact with someone inside the house without success. Officer Gravius advised

6

Rosanna and Josten that he could not yet enter the house, as there were no signs of a forced entry.

Rosanna and Josten then decided to force their way into the house to check on Sheray, and Josten broke through one of the back windows with a brick and "climbed inside." As Josten walked toward the front of the house, he saw a "smashed up TV" in the family room and a "big desk … blocking the front door," which he moved to let Rosanna inside. Rosanna and Josten were struck by a "foul odor" in the house and discovered that Sheray's two dogs and their puppies had been confined — without food or water — to a bathroom and another room downstairs, where the floors were covered with "dog feces and urine." Upstairs, Rosanna and Josten noticed that the bathtub of the hallway bathroom was full of Sheray's clothes and other belongings; that there was "another smashed up TV" in the master bedroom;[4] and that, in the master bathroom, Sheray's clothes were all over the floor and inside the bathtub, and the sink

---

[4] According to Josten, when Felton lived with Sheray and Josten in Chicago, he had previously damaged televisions in their home when he got angry with Sheray.

was full of torn up "papers," including Sheray's diplomas, Josten's birth certificate, and Sheray's Social Security card.

At that point, Rosanna called Officer Gravius to inform him that she and Josten "had made forced entry into th[e] house" out of concern for Sheray and that they found the house in disarray. Shortly thereafter, Officer Gravius and another police officer arrived, and after assessing the downstairs area of the house, the officers went upstairs. In the master bathroom, the officers observed what they believed to be a human leg underneath a large "pile of clothing" in the "center of the floor." After clearing the house and obtaining a search warrant, the officers discovered Sheray's body under the pile of clothes on the bathroom floor. The Henry County coroner pronounced Sheray dead at the scene.

The medical examiner testified that Sheray had "a minimum of approximately 15 or so" "sharp force injuries" and "blunt force injuries" to her head, including "a large wound complex of her face" involving "the nose, the left eye, the left cheek, the forehead," and "the scalp"; "extensive facial fractures"; and a "collapsed" eye.

8

Additionally, Sheray suffered "five sharp wounds of her torso" in the chest and shoulder areas, one of which "struck the liver"; a four-inch "sharp force injury" to her "left wrist"; and a "sharp forced injury of her medial left lower leg below the knee," which was "three and a half inches in length." The medical examiner concluded that Sheray's cause of death was "blunt and sharp force trauma of the head, torso and extremities."

On the late afternoon of March 15, Henry County Police detectives conducted a search of the Felton residence. One of the detectives testified that, during their search, they smelled gasoline in both upstairs bathrooms and noted the presence of liquid inside the bathtubs where Sheray's clothing and belongings had been discarded. This liquid later tested positive for gasoline. Additionally, detectives collected, among other items, the following: (1) a hammer with suspected blood on it from the desk that had been blocking the front door; (2) a pair of scissors with suspected blood on it, a red-handled knife with a broken blade with suspected blood on it, and a pair of gloves — similar to gloves worn by DHL employees — with

9

suspected blood on them from the master bathroom; and (3) from the kitchen, a red sheath for the broken, red-handled knife and an orange sheath without a corresponding knife. At trial, the medical examiner testified that the large "blunt force" injury to Sheray's face was "consistent with being produced by a blunt object like a hammer," and the "sharp force injur[ies]" and "incisions" to her head and torso were "consistent with something sharp like a knife or scissors." The GBI later conducted testing of the hammer and the broken, red-handled knife and determined that these items were positive for blood and matched Sheray's DNA.

On March 15, detectives discovered that Sheray's black 2005 Chrysler 300 was missing from the residence and that Felton's current whereabouts were unknown. After discovering that the cell phone Felton used to call Rosanna on March 14 and 15 was registered to Sheray, detectives submitted an "exigent request" to the cell phone service provider for the corresponding cell phone records. Upon receiving those records and reviewing the call location data and online mapping programs, detectives determined that,

10

between the early morning of March 14 and the afternoon of March 15, Felton's cell phone traveled from Georgia to northern Michigan and then traveled south to Chicago, Illinois, where it stopped.

At trial, two of Felton's cousins, Kevin and Steve Strickland, testified that Felton showed up "out of the blue" at Kevin's house in Chicago on the afternoon of March 15. Felton told his cousins that "Dee Dee" — which was Felton's nickname for Sheray — was "dead"; that she had fallen "down the stairs"; and that he "put her in the bed," hoping she would "wake up." When Steve asked why Felton did not call anyone for help, Felton responded that "[n]obody would believe [him]," and he wanted to "kill[] himself."

At 2:55 a.m. on March 16, Felton called Rosanna and told her "[h]ow much he loved Sheray" and that he was "sorry." Rosanna asked Felton why he killed Sheray, and he said, "You won't see me no more I'm going to kill myself too. You won't ever see me again." Felton also called one of his co-workers from DHL, who testified that he spoke to Felton around lunchtime on March 16, and Felton said Sheray "was in a better place now"; that she "wasn't suffering"; and

11

that Felton was "going to join her." Felton told his co-worker that Sheray had been "making plans to leave him," but he "took control of the situation" and was getting ready "to kill himself."

Around 1:00 p.m. on March 16, Officer Angela Smith with the Chicago Police Department received a call regarding a "wanted individual" — later determined to be Felton — who was "involved in a chase" with local police officers and the Illinois State Patrol. Felton was reportedly driving a 2005 black Chrysler 300. Officer Smith encountered Felton as he drove into the city on Lakeshore Drive. Officer Smith testified that "it was gridlock" at the time, and "multiple squad cars" were pursuing Felton, yelling for him to "stop," show his hands, and "exit his vehicle." According to Officer Smith, Felton did not stop, despite directives from law enforcement, and when his car slowed because of the gridlock around him, "he began to ram the cars, attempting to evade the police." When Felton was able to "squeeze his way out," he drove "towards" Officer Smith, who discharged her weapon, but Felton "continued flight" at "a high rate of speed," ultimately "T-boning another squad car" and "disabl[ing]

12

both vehicles." Law enforcement officers immediately surrounded Felton's car and gave him "multiple orders to exit his vehicle," but "he failed to comply."

Chicago Police Detective Hector Matias testified that he was called to the scene to try to communicate with Felton. According to Detective Matias, he was able to reach Felton on his cell phone, and they spoke for several hours. Felton told Detective Matias that he did not want to come out of the car; that he had "several knives"; and that he wanted to "kill himself." As the call continued, Felton agreed to throw a few of the knives out of the car at Detective Matias's request, but Felton continued "threatening suicide." Detective Matias testified that, "towards the end of the evening, [Felton] started to cut his wrists,"[5] and he began to "shut down" and "apologize[d] for his wife." Felton then hung up the phone and would not answer Detective Matias's phone calls. At that point, "SWAT

_____

[5] One of the detectives positioned near the car could see that Felton was "making movements across his wrists" with a knife. Two of Felton's friends testified that Felton called them during this timeframe, and he told them that "he was stabbing himself."

13

[took] over," and the SWAT team was eventually "able to get [Felton] out of the car" and give him medical attention.

After transporting Felton to the hospital and acquiring a search warrant, Chicago Police Department investigators collected a number of items from inside the Chrysler 300, including a black, serrated kitchen knife and purple, green, and orange-handled knives, which Henry County Police detectives later determined to be "from the same set" as the broken, red-handled knife found in the master bathroom and the red and orange sheaths found in the kitchen of the Felton residence. While in Chicago, Felton was arrested for Sheray's murder and transported to Georgia.

1. Felton first contends that he received ineffective assistance of counsel because, at trial, his counsel failed to request a written jury charge on impeachment based on a witness's bias for or against a party.[6] Felton claims that such a charge was necessary in this case because the State presented testimony demonstrating the prior

_____

[6] This charge does not appear in the Suggested Pattern Jury Instructions, and in his brief, Felton does not specify what language should have been included in such a charge.

14

difficulties between Sheray and Felton, the contentious nature of their relationship, and the negative opinions Rosanna and Josten held about Felton and his treatment of Sheray.

To prevail on his claim of ineffectiveness, Felton "generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice" to him. *Moss v. State*, 311 Ga. 123, 126 (2021) (citing *Strickland v. Washington*, 466 US 668, 687–95 (1984)). If Felton "fails to meet his ... burden of proving either prong of the *Strickland* test" — either deficiency or prejudice — this Court "does not have to examine the other prong." Id. (quotation marks omitted). Because Felton has failed to meet his burden of showing that his trial counsel was constitutionally deficient by failing to request a separate impeachment for bias charge, we need not decide the prejudice prong of the *Strickland* test here. See id.

With respect to deficiency, we have said that for a defendant to prove that his trial counsel's performance was deficient, he "must show that his counsel performed in an objectively unreasonable way

15

considering all the circumstances and in light of prevailing professional norms." *Nesbit v. State*, 321 Ga. 240, 246–47 (2025) (quotation marks omitted). "Under *Strickland*, decisions on requests to charge involve trial tactics to which we must afford substantial latitude, and they provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." *Fuller v. State*, 316 Ga. 127, 132 (2023) (quotation marks omitted).

At the motion-for-new-trial hearing, Felton's appellate counsel asked his trial counsel whether "there was a reason [he] didn't request a written jury instruction on impeachment [of a] witness by showing evidence of bias [of] a witness," and Felton's trial counsel responded that, in this case, he only requested the pattern jury instructions, which do not include such a charge. Felton's trial counsel further explained that he "usually do[es]n't go outside of the suggested patterns unless there's a clear and obvious issue that doesn't appear in the ... pattern instructions," and based on the evidence presented in this case, he did not determine it was

16

necessary to seek any charges outside the suggested pattern jury instructions.

Additionally, at trial, the trial court charged the jury on the credibility of witnesses and a witness's interest or lack of interest, specifically instructing the jury as follows:

> You, the jury, must determine the credibility of the witnesses. In deciding this[,] you may consider all of the facts and circumstances of the case, including the witness's manner of testifying, their intelligence and means and opportunity of knowing the facts of which they testify, the nature of the facts about which they testify, the probability or improbability of their testimony, their interest or lack of interest in the outcome of the case, and their personal credibility as you observe it.

And we have held that these "instructions given by the trial court sufficiently covered the concept of impeachment by showing bias or motive." *Huber v. State*, 319 Ga. 78, 85 (2024).

Because Felton's trial counsel "articulated a reasonable strategy in utilizing the pattern charge" after assessing the evidence presented in this case, *Fuller*, 316 Ga. at 133, and because the bias instruction was substantially covered by the instructions that were given by the trial court, it was not objectively unreasonable to fail to

17

request the additional instruction. See *Huber*, 319 Ga. at 85 (concluding that trial counsel's failure to request a jury instruction on impeachment concerning a witness's bias or motive was not deficient performance because the instructions given by the trial court sufficiently covered "the concept of impeachment by showing bias or motive"). Accordingly, Felton has failed to show that his trial counsel was deficient in this respect, and this claim fails.

2. Felton next contends that his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution were violated by the testimony of several GBI analysts about the conclusions of other non-testifying GBI analysts and by the admission of reports generated by the non-testifying analysts. He relies on the United States Supreme Court's recent decision in *Smith v. Arizona,* which held that the trial testimony of an expert witness who restated a non-testifying laboratory analyst's factual assertions in support of his own opinion testimony violated the defendant's Confrontation-Clause rights. See 602 US 779, 783–84, 795 (2024). The specific testimony and reports of which Felton

18

complains are as follows:

(a) At trial, GBI forensic biologist Ashley Hinkle testified as the "peer reviewer" of the DNA testing, conclusions, and written report of GBI forensic biologist Kimberly Turpin, who did not testify at trial. Turpin conducted the "initial testing" of the orange-handled knife found in Felton's car and the gloves found in the master bathroom of Sheray and Felton's house, and she drafted the corresponding report. Turpin determined that there were two DNA profiles on the gloves; the major contributor was Sheray, and the minor contributor was indeterminable. Turpin determined that the DNA profile on the orange-handled knife matched "the DNA profile of Joseph Felton." At trial, Hinkle testified that, as "the peer reviewer," she "went back and checked [Turpin's] data," "her methods, and "her notes," and Hinkle "agreed with her conclusions." Turpin's report was admitted into evidence at trial.

(b) In the second instance, GBI forensic biologist Emily Schmidt testified as the "peer reviewer" of the DNA testing, conclusions, and written report of GBI forensic biologist Tashika

19

Woodlum, who did not testify at trial because she was no longer employed by the GBI. Woodlum conducted testing of a "cutting" of a pair of shorts that were allegedly forced inside Sheray's mouth during that incident. Woodlum determined that the saliva on the swab and the cutting from the shorts "matched" Sheray's DNA. At trial, Schmidt testified that the DNA analysis in this case and the procedures followed were conducted "in an acceptable manner." Woodlum's report was admitted into evidence at trial.

(c) In the third instance, GBI forensic serologist Melissa West testified that she conducted chemical testing on the gloves found in the master bathroom of Sheray and Felton's house to determine whether there was any blood present, and she concluded blood was present on the gloves. West documented those findings in a report, which was admitted at trial. West also peer-reviewed the testing, conclusions, and written report of GBI forensic biologist Danielle Gibbs, who did not testify at trial because she was no longer employed by the GBI. Gibson tested the orange-handled knife found in Felton's car for the presence of blood, and her testing revealed

20

that the orange-handled knife was positive for blood. At trial, West testified that, as "the peer reviewer," she "reviewed all of [Gibson's] notes and ... reports to see that everything was done in an acceptable manner and followed all policies and procedures." West testified that, based on what she observed and the notes, methods, and information she reviewed from Gibson, "there was blood on that orange knife." Gibson's report was admitted into evidence at trial.

(d) In the final instance, GBI forensic chemist Victoria Oehrlein testified as the "peer reviewer" of the testing, conclusions, and written report of GBI forensic chemist James Wadsworth, who did not testify at trial. Wadsworth conducted testing of jars of liquid found inside Felton's vehicle after he was arrested and determined that gasoline was present in those jars. Oehrlein also reviewed and "reassess[ed]" Wadsworth's "data and report" and issued her own report, which supported Wadsworth's findings and conclusions. Oehrlein's and Wadsworth's reports were admitted into evidence at trial.

(e) On appeal, Felton concedes that he did not object to the testimony of these GBI witnesses or the admission of the GBI crime lab reports at trial, and thus, we review these claims for plain error only. See *Holloway v. State*, 320 Ga. 668, 670 (2025). To establish plain error, Felton "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings." Id. at 670–71 (quotation marks omitted).

When we review an asserted evidentiary error under the plain-error standard, we apply the law existing at the time of the appeal, see *Watkins v. State*, 320 Ga. 862, 872 (2025) (explaining that, under plain-error review, "[t]he current law considered is the law at the time of appellate review rather than at trial") (quotation marks omitted), and "[b]ecause *Smith v. Arizona* was decided before the time of this appellate review, it is current law for purposes of this

22

analysis." Id.[7] However, here, we need not decide whether the trial court committed clear or obvious error by admitting the testimonial out-of-court statements and reports of non-testifying GBI witnesses under *Smith* because Felton cannot meet the third prong of the plain-error test to show that the admission of this evidence — which primarily established that Felton's blood was present on a knife found in his vehicle and that Sheray's DNA was present on a pair of shorts recovered in the January 1, 2014 incident and on a pair of gloves collected at the murder scene — affected his "substantial rights," particularly in light of the strong evidence of his guilt in this case. See *Jones v. State*, 317 Ga. 466, 473 (2023) (holding that, "[e]ven assuming ... it was clear error to admit" portions of the appellant's video-recorded interview at trial, "any error did not affect [his] substantial rights" because the evidence "was harmless in light of the substantial evidence of [his] guilt"). See also *State v.*

---

[7] In *Smith*, the Supreme Court held that "[a] State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her," and "[n]either may the State introduce those statements through a surrogate analyst who did not participate in their creation." *Smith*, 602 US at 802–03.

*Johnson*, 305 Ga. 237, 240 (2019) ("The third prong of the plain error test requires that the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it likely affected the outcome of the trial court proceedings.").

The evidence of Felton's guilt in this case was substantial and included his own statements and admissions to multiple people, strongly suggesting his guilt in causing Sheray's death, as well as evidence of (1) his aggressive and controlling behaviors towards Sheray and his unreasonable fixation with Sheray; (2) his dishonesty with Rosanna about Sheray's sickness and his lies about his whereabouts around the time of Sheray's murder; (3) his threats to kill Sheray if she was cheating on him; (4) his failure to report to work as scheduled during the pertinent timeframe; (5) the lack of any signs of forced entry into the Felton residence on March 15, indicating that whoever caused Sheray's death had ready access to the house; (6) Felton's flight to Chicago in Sheray's car before Sheray's body was discovered; (7) Felton's flight from law

24

enforcement officers in Chicago when they tried to stop his vehicle; and (8) Felton's possession of multiple knives in his vehicle in Chicago, some of which he used to injure himself during the police stand-off and some of which appeared to be part of the same set as the broken, red-handled knife found in the master bathroom of the Felton residence, which tested positive for Sheray's blood.

In light of the strong evidence presented in this case, Felton has not met his burden to show that, absent the admission of the GBI analysts' testimony and reports, a "reasonable probability" exists that the "outcome of his trial would have been different." *Johnson*, 319 Ga. at 572. Accordingly, Felton's claim of plain error predicated on the admission of this evidence fails. See id.

3. Felton also contends that the trial court plainly erred by permitting the State to introduce evidence that Felton possessed several colored-handled knives inside his vehicle in Chicago because the knives were "not intrinsic" and were "improper character evidence"; that the State failed to show a probative connection between the knives and Sheray's death; and that the prejudicial

effect of this evidence substantially outweighed any probative value.[8] Felton concedes that he did not object to the admission of this evidence at trial, and so, we review only for plain error.

As noted above, plain-error review consists of four prongs. See *Holloway*, 320 Ga. at 670. We need not analyze all four prongs in this case because Felton has failed to establish that the trial court clearly or obviously erred in admitting the knife evidence, which — as explained below — is intrinsic evidence, or that the probative value of this evidence was substantially outweighed by its prejudicial effect. See *Roberts v. State*, 315 Ga. 229, 238 (2022). We also need not address Felton's argument that evidence of his possession of knives is improper character evidence because we conclude the knives are intrinsic evidence and, thus, are not subject to OCGA § 24-4-404(b). See *Heade v. State*, 312 Ga. 19, 24 (2021).

> Evidence is admissible as intrinsic evidence when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2)

---

[8] We read Felton's argument as asserting that the evidence was inadmissible under OCGA §§ 24-4-403 and 24-4-404(b), although Felton cites neither statute in his brief.

necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense. Evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. Evidence of other acts is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Heade*, 312 Ga. at 24–25 (cleaned up). "[T]here is no brightline rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence." *Harris v. State*, 310 Ga. 372, 381 (2020).

Here, evidence showing that Felton was in possession of multiple, colored-handled knives in Chicago — where he had fled in Sheray's vehicle shortly before her body was discovered and in which he was arrested the next day — was intrinsic in this case because it was "inextricably intertwined with the evidence regarding the

27

charged offense" and "form[ed] an integral and natural part" of the "account of the crime." *Heade*, 312 Ga. at 25. The evidence presented at trial demonstrated that the knives with colored handles that Felton had in the car with him when he was arrested appeared to come from the same knife set as two items found at the scene: the broken, red-handled knife that was found near Sheray's body with Sheray's blood on it, and the orange knife sheath found in the kitchen of the Felton residence, which appeared to match an orange-handled knife that Felton had with him in the car. Thus, the knives were "inextricably intertwined" with the evidence regarding Sheray's death by sharp-force wounds. *White v. State*, 307 Ga. 882, 889 (2020) (concluding that evidence of Appellant's behavior within several hours of the murder, including brandishing the murder weapon while threatening to "take" someone's life, "was integral" to the account of "the events leading up to the killing" and was "inextricably intertwined with the relevant evidence"). Moreover, Felton's possession and use of these knives to threaten the police and his own life was connected to his flight after Sheray's murder,

and "[e]vidence of flight is generally intrinsic" because it is evidence of the defendant's "consciousness of guilt." *Jenkins v. State*, 313 Ga. 81, 89 (2022) (cleaned up).

However, evidence that is intrinsic must still satisfy OCGA § 24-4-403. See *Heade*, 312 Ga. at 27. Although "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," OCGA § 24-4-403, "[t]here is no mechanical solution for this balancing test," and "a trial court must undertake in each case a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination." *Heade*, 312 Ga. 26–27. And "[w]e have explained that this balance should be struck in favor of admissibility." Id. at 27.

While evidence that Felton possessed multiple knives as he fled from the crime scene was certainly prejudicial to Felton, "in a criminal trial, inculpatory evidence is inherently prejudicial; it is

only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." *Anglin v. State*, 302 Ga. 333, 337 (2017) (quotation marks omitted). And evidence that Felton possessed these knives in his car when he was arrested was not — on its own — unfairly prejudicial. See *Harris v. State*, 313 Ga. 225, 232 (2022). Therefore, because evidence showing that Felton was in possession of multiple, colored-handled knives at the time of his arrest was properly admitted in this case, Felton cannot meet his burden as to the second prong of plain-error review, and this claim fails. See *Williams*, 315 Ga. at 495.

4. Finally, Felton argues, in reliance on *State v. Lane*, 308 Ga. 10 (2020), that the "cumulative effect of the evidence erroneously admitted at trial ... prejudiced Felton and denied him a fair trial." We disagree.

"To establish cumulative error, a defendant must demonstrate that at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a

30

fundamentally fair trial." *State v. Wood*, 316 Ga. 811, 821 (2023) (citing *Lane*, 306 Ga. at 21).

Here, even if the trial court erred by allowing certain GBI analysts to testify about the conclusions of other non-testifying analysts and by admitting the absent analyst's reports, Felton's cumulative-error claim fails. See *Wood*, 316 Ga. at 822. As detailed in Division 2, the other evidence presented against Felton was overwhelming, and in light of this overwhelming evidence, Felton "has not demonstrated that the prejudicial effect of … the trial court error denied him a fundamentally fair trial." *Wood*, 316 Ga. at 822. See also *Huff v. State*, 315 Ga. 558, 568 (2023) (holding that the appellant's cumulative-error claim failed because the appellant did not demonstrate that "the prejudicial effect of the assumed trial court errors … denied him a fundamentally fair trial, given the strong evidence against him"). Accordingly, this final contention also fails.

*Judgment affirmed. All the Justices concur.*